**STATE of Utah, Plaintiff and Respondent,**

v.

**Dick R. RUSSELL, Defendant and Appellant.**

**No. 18591.**

Supreme Court of Utah.

Feb. 9, 1987.

---

Phil L. Hansen, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., and Earl F. Dorius and David B. Thompson, Asst. Attys. Gen., Salt Lake City, for plaintiff and respondent.

HOWE, Justice:

Defendant appeals from his jury conviction of two counts of murder in the second degree, contending that he was not convicted by a unanimous jury verdict and that the evidence was insufficient to convict him as charged.

Defendant Russell and his family were neighbors to Floyd and LaRue Rowley,

whose son occasionally tended the Russell children. Floyd and LaRue were shot to death in their home by Russell during a discussion in which he charged that their son had taken indecent liberties with his five-year-old daughter.

At the close of defendant's case, the jury was given a general verdict form on both counts and instructed on murder in the second degree as follows:

### Instruction No. 14

Before you can convict the defendant, Dick Roundy Russell, of the crime of Murder in the Second Degree, a lesser included offense of the crime charged in Count I, you must believe from all the evidence and beyond a reasonable doubt each and every one of the following elements of that offense.

1. That on or about the 16th day of May, 1981, in Salt Lake County, State of Utah, Floyd Rowley was killed; and

2. That defendant is the person who caused the death of Floyd Rowley and did so under one of the following circumstances:

    a. Defendant intentionally or knowingly caused the death of Floyd Rowley; or

    b. Defendant intended to cause serious bodily injury to Floyd Rowley and committed an act clearly dangerous to human life that caused the death of Floyd Rowley; or

    c. Defendant acted under circumstance[s] which evidenced a depraved indifference to human life and engaged in conduct which created a grave risk of death to another and thereby caused the death of Floyd Rowley.

. . . .

If on the other hand, you are convinced of the truth of element number 1 above and any one of the three circumstance[s] in element number 2 above beyond a reasonable doubt, then you must find the defendant guilty of Murder in the Second Degree a lesser included offense of the crime charged in Count I.

A similar instruction was given on Count II which charged the murder of LaRue Rowley.

Defendant requested that the jury be instructed that they had to choose which of the three alternatives (a, b, or c) listed under paragraph 2 of those instructions formed the basis for any verdict they might return. His requested instruction to that effect was rejected. He objected to Instruction No. 14 on the ground that it gave under paragraph 2 "three alternatives, without telling the jury that they must be unanimous in one or the other of those three alternatives." The jury returned a guilty verdict on both counts. Over the objection of the State, defendant then asked that the jury be polled as to which alternative they had chosen to convict defendant. This request was granted, and the jurors answered that they had chosen different alternatives in paragraph 2 to arrive at their guilty verdicts.

Before we address defendant's two contentions on appeal, we note the State's objection to the polling of the jury on which point it has briefed us. A defendant may poll the jury to determine whether the verdict is unanimous. U.C.A., 1953, § 77-35-21(f). The purpose of polling is to determine that the verdict signed by the foreman is that of the individual jurors and not one that has been coerced or caused by mistake. *State v. Agtuca,* 12 Wash.App. 402, 529 P.2d 1159 (1974). Evidence that the jury was confused or that it misunderstood or disregarded the facts or the applicable law is inadmissible as violative of the long-standing policy against attempts to undermine the integrity of the verdict. *Groen v. Tri-O-Inc.,* 667 P.2d 598 (Utah 1983). All inquiries into the mental processes of the jury are improper. *See State v. Couch,* 635 P.2d 89, 95 (Utah 1981). Defendant properly polled the individual jurors to determine if the verdict on each count was theirs. The court then continued: "It has also been requested that you be polled as to which subdivision under the section of criminal homicide, murder in the second degree, you found you reached your

verdict at." Inasmuch as the jury had been instructed under a general verdict form and had been told that it could find defendant guilty of "any one of the three circumstances," the polling at that point became an attempt to reach their thought processes and was impermissible. Consequently, the result of the poll will play no part in our decision on the two issues before us.

## I.

■ Defendant first contends that the second degree murder statute, U.C.A., 1953, § 76–5–203, defines three separate and distinct theories upon which the jury could have convicted him. Consequently, he argues, he was deprived of his right to a unanimous jury verdict, Utah Const., art. I, § 10, when the trial court refused to give his requested instruction that the jury had to unanimously agree upon one of the three theories as the basis for its verdict. He refers to three Utah cases where we were faced with, but did not decide, a similar question. In *State v. Rasmussen*, 92 Utah 357, 68 P.2d 176 (1937), the defendant was charged with involuntary manslaughter, consisting of either an unlawful act not amounting to a felony, on the one hand, or a lawful act performed in an unlawful manner, on the other. A plurality of this Court found any error harmless. In *State v. Roedl*, 107 Utah 538, 155 P.2d 741 (1945), the error assigned dealt with an instruction on murder in the first degree. Again, this Court found any error in the instruction harmless. In *State v. Thompson*, 110 Utah 113, 170 P.2d 153 (1946), a unanimous jury verdict on a first degree murder charge based either on a "depraved mind regardless of human life" or "malice aforethought" theory was attacked on appeal as containing two different theories precluding unanimity. The *Thompson* Court found it unnecessary to address the issue as the disputed instruction to the jury had contained the limiting language that "all of the jurors must concur as to *either one or the other* of the kinds of murder above referred to. . . ." (Emphasis added.) Thus, the question presented by defendant in the instant case has never been squarely decided by this Court.

Many jurisdictions have considered the scope of the constitutional requirement of a unanimous jury verdict in criminal cases. The decisions are virtually unanimous that a defendant is not entitled to a unanimous verdict on the precise manner in which the crime was committed, or by which of several alternative methods or modes, or under which interpretation of the evidence so long as there is substantial evidence to support each of the methods, modes, or manners charged. One of the earliest cases is a decision of the Court of Appeals of New York in 1903, *People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989. In that case, the defendant was charged with premeditated murder or murder committed during the commission of a felony. In answer to the defendant's contention that the jury had to be unanimous upon which theory it convicted him, the court stated the following, which has been quoted and relied upon by many subsequent cases:

> There was but a single crime charged in the indictment against the defendant,— that of murder in the first degree; and the only issue to be determined by the jury was whether the defendant had been guilty of that crime. Under our statute (section 183, Pen.Code), so far as applicable to the case before us, proof either that the defendant killed the deceased with a deliberate and premeditated design to effect his death, or while the defendant was engaged in the commission of a felony, or an attempt to commit a felony, though without any design to take life, established his guilt of the crime charged. "It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other."

65 N.E. at 989–90 (citation omitted). Other cases which are in accord that the jury does not have to be unanimous as to whether the defendant committed premeditated murder or felony murder are *Newsted v. State*, 720 P.2d 734 (Okla.Crim.App.1986); *State v. Ellison*, 36 Wash.App. 564, 676 P.2d 531 (1984); *State v. Encinas*, 132 Ariz. 493, 647 P.2d 624 (1982); *State v. Williams*, 285 N.W.2d 248 (Iowa 1979) (dicta), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980); *People v. Fullwood*, 51 Mich.App. 476, 215 N.W.2d 594 (1974); *People v. Milan*, 9 Cal.3d 185, 107 Cal.Rptr. 68, 507 P.2d 956 (1973); *State v. Reyes*, 209 Or. 595, 308 P.2d 182 (1957).

The rule of *People v. Sullivan, supra,* has also been employed in cases where the defendant was convicted of assault. In *State v. James*, 698 P.2d 1161 (Alaska 1985), the jury was instructed that it could find the defendant guilty if it unanimously agreed that he had committed first degree assault as described in either of two subsections of the statute. One subsection required an intent to cause serious physical injury to another person. The other subsection required the intentional performing of an act that results in serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life. Similarly, in *Wells v. Commonwealth*, 561 S.W.2d 85 (Ky.1978), the court relying upon *People v. Sullivan, supra,* held that the jury in convicting the defendant of assault did not have to be unanimous as to whether he (1) intended to cause serious physical injury, or (2) wantonly engaged in conduct creating a grave risk of death and under circumstances manifesting extreme indifférence to human life.

The rule has also been employed in cases of armed robbery where the jury was allowed to convict if they found that the defendant used force or simply threatened imminent use of force, *Manson v. State*, 101 Wis.2d 413, 304 N.W.2d 729 (1981); in cases where the jury was allowed to convict the defendant upon finding that he participated in the commission of the crime, either as a principal or an accessory or, in one case, as a conspirator, *Holland v. State*, 91 Wis.2d 134, 280 N.W.2d 288 (1979), *cert. denied*, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *People v. Burgess*, 67 Mich.App. 214, 240 N.W.2d 485 (1976); *State v. Carothers*, 84 Wash.2d 256, 525 P.2d 731 (1974) (overruled on other grounds); in cases of driving while under the influence of intoxicating liquor where the defendant could be convicted on proof of either being under the influence or having 0.10% or more by weight of alcohol in his blood, *State v. Bratthauer*, 354 N.W.2d 774 (Iowa 1984); *State v. Franco*, 96 Wash.2d 816, 639 P.2d 1320 (1982); and in a murder case where unanimity of the jury was not required as to whether the defendant intended to kill the victim or his companion, *State v. Flathers*, 57 S.D. 320, 232 N.W. 51, 72 A.L.R. 150 (1930).

The *Sullivan* rule has also found application in cases where it was held that the jury did not have to be unanimous as to the exact mens rea of the defendant where the statute contained more than one mens rea. In *State v. Richardson*, 24 Wash.App. 302, 600 P.2d 696 (1979), the defendant was charged with second degree assault. The jury was instructed that they could convict the defendant if they found that (1) he knowingly assaulted the victim with a weapon likely to produce harm; or (2) he knowingly inflicted grievous bodily harm upon the victim; or (3) he caused physical injury to the victim by means of criminal negligence. In *State v. Dixon*, 127 Ariz. 554, 622 P.2d 501 (App.1980), the jury was charged that they could convict the defendant of theft if they found he (1) knowingly controlled property of another with intent to deprive him of such property; or (2) controlled property of another, knowing or having reason to know that the property was stolen.

There are limitations on the rule, however. If the statute under which the defendant is convicted actually defines more than one crime and not merely one crime which may be committed in several different ways, the defendant is entitled to jury unanimity on which crime he is guilty of

committing. That is the crux of *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977), upon which the defendant in the instant case relies and upon which defendants have generally relied in other cases in which the question of unanimity was raised. In *Gipson*, the defendant was charged with violating a statute prohibiting six enumerated criminal acts. The defendant was charged with violating the statute by committing various criminal acts in several incidents. The jury instruction permitted conviction without requiring unanimity about which act the defendant had committed and in which incident. The Court of Appeals reversed the conviction and held that the jury should have been required to agree upon "just what the defendant did," i.e., the jury must unanimously agree on the actus reus element of the offense because the prohibited acts fell into two conceptually distinct categories. One group of acts interdicted the receipt, concealing, or storing of motor vehicles or aircraft. The other category interdicted the bartering, selling, or disposing of any such property. The defendant was entitled to jury unanimity as to which category of crime he committed. In this connection, see *State v. Ewing*, 174 Or. 487, 149 P.2d 765 (1944); *People v. Scofield*, 203 Cal. 703, 265 P. 914 (1928); *State v. Arndt*, 87 Wash.2d 374, 553 P.2d 1328 (1976); *State v. Green*, 94 Wash.2d 216, 616 P.2d 628 (1980).

■ In the instant case, defendant was convicted under section 76–5–203 which provides that second degree murder may be committed in different manners and with different mens rea. It is clear, however, that only one crime is defined—that being second degree murder. Thus, we do not have in this case the problem of several distinct crimes being defined in a single statute as in *United States v. Gipson, supra.* The jury found that defendant killed both Floyd and LaRue Rowley with the mens rea and under the circumstances set out in either subsections (a), (b), or (c) of the statute. (See instruction 14 set out, *infra.*) Under the virtually unanimous case law which we have discussed above, defendant was not entitled to unanimity on

(a), (b), or (c). We limit our decision to that proposition and do not express any opinion on the necessity of unanimity in other situations not present in this case. Defendant has not cited any authority and we have been unable to find any which would provide a basis for holding that the jury must be unanimous as to which subsection of the statute defendant's conviction fits under. This void is understandable. Several courts have commented on the difficulty that would be encountered with juries if there were such a requirement. We concur with the observation of the Supreme Court of Alaska in *State v. James*, 698 P.2d at 1165, where it stated:

> In determining whether to adopt the *Sullivan* rule for Alaska, we must consider the consequences of its rejection. There are differences in conduct, intent or circumstances between the subsections of almost every criminal statute in our code. Rejection of the *Sullivan* rule would therefore result in juror disagreement over semantics in many cases in which they unanimously agree that the defendant committed the wrongful deed. Our experience is that jurors have a keen sense of justice that is well served by the *Sullivan* rule. By requiring semantic uniformity we encourage overcomplicated instructions and hung juries in cases in which the jurors actually agree upon the defendant's guilt.

Similar concern has been expressed on two occasions by the Supreme Court of Wisconsin. In *Holland v. State*, 91 Wis.2d 134, 280 N.W.2d 288 (1979), the defendant was convicted of second degree murder. The jury was instructed that he could be found guilty in three alternative ways—direct commission, aiding and abetting, and conspiracy. In answer to the defendant's contention that the jury had to be unanimous as to the theory of his participation in the crime, the court after quoting with approval from *People v. Sullivan, supra,* and after distinguishing *United States v. Gipson, supra,* observed, "To require unanimity as to the manner of participation would be to frustrate the justice system, promote

endless jury deliberations, encourage hung juries, and precipitate retrials in an effort to find agreement on a nonessential issue." Later, in *Manson v. State*, 101 Wis.2d 413, 304 N.W.2d 729 (1981), where the defendant who had been convicted of armed robbery contended that the jury had to be unanimous in deciding whether the taking was accomplished by using force against the person of the owner or by simply threatening the imminent use of force, the court held that requiring such unanimity would raise serious characterization problems which should be avoided.

## II.

The jury was instructed on first degree murder, as well as on the lesser included offenses of second degree murder, manslaughter, and negligent homicide. It found defendant guilty of two counts of second degree murder. Defendant assails the convictions on the grounds that they find no support in the evidence and that viewing the evidence in the light most favorable to the State, only a conviction of manslaughter would have been warranted. This contention requires a statement of the facts surrounding the shootings.

When defendant arrived home one Saturday afternoon from a business trip, his wife told him that their five-year-old daughter had complained that the Rowley's son had taken indecent liberties with her. Defendant, disturbed by this news, walked a short distance down the street to the Rowley residence. There he discussed the accusation with Floyd and LaRue Rowley for about one-half hour. During this time, there was no argument nor was there any hostility shown toward defendant. Defendant stated that he would call and return later when the Rowleys' son was there. Upon leaving, defendant remarked, "I don't want to hurt anyone over this."

After defendant returned to his home, he and several friends discussed business and the accusation made by his daughter. Defendant had earlier in the day consumed some beer, and his drinking continued during the afternoon when he also consumed some bourbon. At about 6:00 p.m., he either called or received a call from Mrs. Rowley. According to defendant, he told her that he was drunk, angry, and not making any sense, but that he would come to their home in the morning and "we can get it all straightened out then." Mrs. Rowley then or in a later telephone call urged him to come now. Defendant went to his bedroom and took from his closet a handgun which he placed in the back pocket of his pants. On his way to the Rowleys' home, he encountered some friends to whom he gave a short but intelligible response to a question they asked about fishing.

Defendant entered the Rowley home through a back door. He, Floyd, LaRue, their son, and a daughter went into the living room. A discussion ensued in which defendant claims Floyd made light of the accusation. The son and daughter denied their father made any such statement but admitted that defendant was loudly screaming and showed signs of drinking. Finally, defendant pulled the gun from his pocket, dropped it, picked it up, walked over to where Floyd was seated, and pointed the gun in Floyd's face stating, "If I don't start getting some answers, I am going to start blowing everybody away." Floyd told defendant that they could resolve the problem like adults and that there was no need for guns. LaRue placed her hand on defendant's arm and urged him to put his gun away. Floyd attempted to move the gun away from his face and to get up from the chair. Defendant shot him once in the chin killing him.

Defendant exited the house through the rear door and ran around to the front of the house where he encountered LaRue as she came out. When she saw him, she ran back into the house. Defendant raised his gun, aimed it at her as she ran, and then shot her through a large picture window next to the front door. She died several hours later. Defendant then shot himself twice in the chest from which wounds he recovered after hospitalization.

Defendant argues that the evidence will only permit at the most a conviction of manslaughter. U.C.A., 1953, § 76-5-205, defines manslaughter as:

(1) Criminal homicide constitutes manslaughter if the actor:

(a) Recklessly causes the death of another; or

(b) Causes the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse....

Defendant argues that he had a reasonable belief that his five-year-old daughter had been abused, that he was angry and had been drinking all afternoon, that he told the Rowleys that he did not want to discuss the matter further until morning, that the Rowleys urged him to come now, that he went to resolve the matter and became infuriated at a specious remark made by Floyd, that he pulled his gun out and pointed it at Floyd to impress him with the seriousness of the matter, and that in his anger or by accident, Floyd was shot. He afterwards recklessly shot through the front room window and unintentionally killed LaRue.

Assuming that the evidence would support a conviction of manslaughter, the jury who are the sole judges of the facts, did not view the conflicting evidence that way. We do not agree with defendant that the evidence does not also support his second degree murder convictions. He was seated in the front room of his neighbors' home discussing a problem which had arisen concerning their children. Apparently when he received no acknowledgement from any of the Rowleys that the incident had occurred, the evidence permits the inference that he pulled out his gun and pointed it in Floyd's face in an effort to force a confession or acknowledgement. The Rowley children testified that at no time was there any comment from any of the Rowley family that made light of the situation or was designed to provoke defendant. Defendant remarked, "If I don't start getting some answers, I am going to start blowing everybody away." He testified that he had previously fired the gun and was aware he first had to pull back the hammer and then pull the trigger before the gun would fire. He also testified that he knew the gun was a dangerous weapon and was aware of what the result would be if someone were to shoot another in the face. The shooting of LaRue occurred moments later after defendant had run out the back door and around the house to the front where he took aim at LaRue and then shot through a window. Given this evidence, the jury reasonably could have rejected defendant's theory that he "recklessly caused the death of another" or that he "caused the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse." On the other hand, the evidence supports the finding that defendant killed his victims with one of the mens rea and under the circumstances in our second degree murder statute, section 76-5-203.

The conviction and sentence are affirmed.

HALL, C.J., concurs.

STEWART, Associate Chief Justice (concurring separately):

I join in affirming the defendant's convictions of second degree murder. Although I submit that it would have been preferable for the trial judge to give an instruction on unanimity as to the defendant's mens rea, I do not believe the fundamental principle of jury unanimity was violated in this case. I write separately, however, to emphasize that in a different context, when a jury is allowed to convict on the basis of alternative mental states without requiring juror unanimity, a constitutional violation might well occur.

I.

The jury instruction given in this case, which tracked U.C.A., 1953, § 76-5-203 (1978 ed.), the second degree murder statute, permitted the jury to return a verdict of guilty even though the jurors were not unanimous as to the mental state of the

defendant.[1] Thus, the instruction described three possible alternative mental states which would suffice for a guilty verdict. Because those mental states are so highly similar, from the point of view of mental functioning and culpability, I think the jury was for essential constitutional purposes unanimous on the mens rea element.

Nevertheless, I fear that a broad application of the *Sullivan* rule, which the Court adopts, will result in a violation of the Utah constitutional requirement of jury unanimity if a criminal conviction is allowed on proof of alternative mental states which are not essentially the same either in nature or degree of culpability.[2] To hold that a jury need only agree on the act committed but need not agree on the actor's mental state ignores the importance of a defendant's mental state as a determinant of culpability under the Utah Criminal Code and traditional principles of criminal responsibility. The homicide statutes, in particular, make the culpability of a defendant turn on his mental state at the time of the killing.

Subtle, but important, distinctions exist between mental states that lie side by side along the continuum of various mental states. If unanimity as to a mental state is not required, jurors may forego a thorough analysis of the defendant's mental state and of possible lesser included offenses. The difference between depraved indifference murder, which is one form of second degree murder, and reckless manslaughter, which is a lesser crime, is so subtle that under different facts, I would think it

1. Instruction number fourteen read as follows:
   Before you can convict the defendant, Dick Roundy Russell, of the crime of Murder in the Second Degree, a lesser included offense of the crime charged in Count I, you must believe from all the evidence and beyond a reasonable doubt each and every one of the following elements of that offense:
   1. That on or about the 16th day of May, 1981, in Salt Lake County, State of Utah, Floyd Rowley was killed; and
   2. That defendant is the person who caused the death of Floyd Rowley and did so under one of the following circumstances:
      a. Defendant intentionally or knowingly caused the death of Floyd Rowley; or
      b. Defendant intended to cause serious bodily injury to Floyd Rowely [sic] and committed an act clearly dangerous to human life that caused the death of Floyd Rowely [sic]; or
      c. Defendant acted under circumstance [sic] which evidenced a depraved indifference to human life and engaged in conduct which created a grave risk of death to another and thereby caused the death of Floyd Rowley.
   If, after careful consideration of all of the evidence in this case you are not convinced beyond a reasonable doubt of the foregoing elements, then you must find the defendant not guilty of Murder in the Segond [sic] Degree, a lesser included offense of the crime charged in Count I. If you find the defendant not guilty of Murder in the Second Degree under this instruction then you should consider the elements of Manslaughter as set forth in the next instruction.
   If, on the other hand, you are convinced of the truth of element number 1 above and any one of the three circumstance [sic] in element number 2 above beyond a reasonable doubt, then you must find the defendant guilty of Murder in the Second Degree a lesser included offense of the crime charged in Count I.
   A similar instruction was given for the murder of LaRue Rowley.

2. *State v. James*, 698 P.2d 1161 (Alaska 1985) (cited by the majority opinion), presents a clear example of a situation where unanimity is not ensured by merely requiring jury agreement on the crime committed as distinguished from the elements of the crime. The defendant was convicted of first degree assault. The case was presented to the jury under two alternative statutory theories. At the time, the statute allowed a conviction for first degree assault if a person

   > [1] with intent to cause *serious physical injury* to another person, ... causes *physical injury* to any person by means of a dangerous instrument; [or 2] ... [if] he intentionally performs an act that results in *serious physical injury* to another person under circumstances manifesting extreme indifference to the value of human life.

   Alaska Stat. § 11.41.200(a)(1), (3) (emphasis added). Justice Rabinowitz in his dissenting opinion correctly noted that presenting both theories to the jury without a requirement of unanimity as to one or the other runs a serious risk of the jurors agreeing that a defendant acted with extreme indifference to the value of human life, but that only physical injury, as opposed to serious physical injury, was the result. Jurors could have thought that that was sufficient for a conviction of first degree assault when it was only a third degree assault. *State v. James*, 698 P.2d at 1168 (Rabinowitz, J., dissenting).

would be error not to give a jury instruction on unanimity on the second degree murder charge.

## II.

The Due Process Clause protects the accused against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). Stronger proof is required in criminal cases than in civil cases in order to reduce the inevitable margin of error in fact-finding. *Id.* at 363, 90 S.Ct. at 1072. The unanimous jury requirement, like the reasonable doubt standard, also "impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue." *Id.* at 364, 90 S.Ct. at 1072. Article I, section 10 of the Utah Constitution, which states, "[I]n criminal cases the verdict shall be unanimous [but] [i]n civil cases three-fourths of the jurors may find a verdict," suggests that the certitude of unanimous jury verdicts in criminal cases was fundamentally important to our Constitution's framers.

Because due process requires that each essential element of a crime be proved beyond a reasonable doubt, fundamental fairness also requires jurors to agree unanimously on each essential element, including the requisite type of mens rea. The critical question is, "How far up the trunk and branches of the evidence tree must this unanimity extend?" *State v. Rasmussen*, 92 Utah 357, 376, 68 P.2d 176, 185 (1937) (Wolfe, J., concurring in the result). Clearly, unanimity is not required on each evidentiary point, but it is required, in my view, as to both the ultimate criminal act committed and the defendant's state of mind.

The verdict in this case was essentially unanimous because all of the mental states in § 76-5-203 [3] which were submitted to the jury are forms of common law malice aforethought and because, given the facts of the case, it is unreasonable to suppose the defendant acted with a lesser mental state.

In convicting the defendant of second degree murder under either § 76-5-203(1)(a), (b), or (c), each juror found beyond a reasonable doubt that the defendant either (1) intentionally caused the death of the victims; (2) intended to cause serious bodily injury to the victims and committed an act clearly dangerous to human life; or (3) acted with a depraved indifference to human life and knew that his conduct created a grave risk of death.

These definitions of second degree murder and the definitions in the Model Penal Code (from which the Utah Code's murder provision is derived in substantial part) are statutory definitions of the various mental states which at common law constituted malice aforethought. Model Penal Code Commentary, art. 210, § 210.2 comments 1 & 2, at 13–19 (1980) ("MPC Commentary"); U.C.A., 1953, § 76-5-203 (1978 ed.); U.C.A., 1953, § 76-30-1, -2, -3 (1953 ed.) (repealed 1973).

Prior to 1973, murder in Utah was defined as "the unlawful killing of a human being with malice aforethought." U.C.A., 1953, § 76-30-1 (1953 ed.) (repealed 1973).

---

**3.** Section 76-5-203 read as follows:

Murder in the second degree.—(1) Criminal homicide constitutes murder in the second degree if the actor:

(a) Intentionally or knowingly causes the death of another; or

(b) Intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another; or

(c) Acting under circumstances [objectively] evidencing a depraved indifference to human life, he [knowingly] engages in conduct which creates a grave risk of death to another and thereby causes the death of another [*see State v. Fontana*, 680 P.2d 1042 (Utah 1984)]; or

(d) While in the commission, attempted commission, or immediate flight from the commission or attempted commission of aggravated robbery, robbery, rape, forcible sodomy, or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping, or kidnapping, causes the death of another person other than a party.

(2) Murder in the second degree is a felony of the first degree.

In *State v. Russell*, 106 Utah 116, 145 P.2d 1003 (1944), the Court defined the intent necessary to constitute malice aforethought:

> In order to have the necessary *malice* to commit murder (not necessarily murder in the first degree), the killing must be unlawful, it must result from or be caused by an act or omission to act committed with one of the following intentions: (1) an intention or design previously formed to kill or cause great bodily injury; or (2) an intention or design previously formed to do an act or omit to do an act, knowing that the reasonable and natural consequences thereof would be likely to cause death or great bodily injury; or (3) a previously thought out intentional or designed perpetration or attempt to perpetrate one of certain kinds of felonies.

*Id.* at 126, 145 P.2d at 1007 (emphasis in original). Similarly, the MPC Commentary summarizes the common law concept of malice aforethought as follows:

> At common law, murder was defined as the unlawful killing of another human being with "malice aforethought." Whatever the original meaning of that phrase, it became over time an "arbitrary symbol" used by judges to signify any of a number of mental states deemed sufficient to support liability for murder. Successive generations added new content to "malice aforethought" until it encompassed a variety of mental attitudes bearing no predictable relation to the ordinary sense of the two words....
>
> Various authorities have given different summaries of the several meanings of "malice aforethought." Generally, these definitions converge on four constituent states of mind. First and foremost, there was *intent to kill*. Common-law authorities included in the notion of intent to kill awareness that the death of another would result from one's actions, even if the actor had no particular desire to achieve such a consequence. Thus, intentional or knowing homicide was murder unless the actor killed in the heat of passion engendered by adequate provocation, in which case the crime was manslaughter. A second species of murder involved *intent to cause grievous bodily harm*. Again, knowledge that conduct would cause serious bodily injury was generally assimilated to intent and was deemed sufficient for murder if death of another actually resulted. A third category of murder was sometimes called *depraved-heart murder*. This label derived from decisions and statutes condemning as murder unintentional homicide under circumstances evincing a "depraved mind" or an "abandoned and malignant heart." Older authorities may have described such circumstances as giving rise to an "implied" or "presumed" intent to kill or injure, but the essential concept was one of *extreme recklessness* regarding homicidal risk. Thus, a person might be liable for murder absent any actual intent to kill or injure if he caused the death of another in a manner exhibiting a "wanton and wilful disregard of an unreasonable human risk" or, in confusing elaboration, a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty." The fourth kind of murder was based on intent to commit a *felony*. This is the origin of the felony-murder rule, which assigns strict liability for homicide committed during the commission of a felony. These four states of mind exhausted the meaning of a "malice aforethought"; the phrase had no residual content.

MPC Commentary, Art. 210, § 210.2 comment 1, at 13–15 (1980) (emphasis added) (footnotes omitted).

The MPC attempted to clarify, modify, and codify the mental states and circumstances under which homicide is considered murder. The MPC defines murder as follows:

> § 210.2 Murder
>
> (1) Except as provided in Section 210.-3(1)(b), criminal homicide constitutes murder when:

(a) it is committed purposely or knowingly; or

(b) it is committed recklessly under circumstances manifesting extreme indifference to the value of human life. Such recklessness and indifference are presumed if the actor is engaged or is an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, rape or deviate sexual intercourse by force or threat of force, arson, burglary, kidnapping or felonious escape.

(2) Murder is a felony of the first degree [but a person convicted of murder may be sentenced to death, as provided in Section 210.6].

(Footnote omitted.)

The MPC drafters deleted intent to cause grievous bodily harm "as an independently sufficient culpability for murder [because of] the judgment that it is preferable to handle such cases under the standards of extreme recklessness and recklessness" contained in the MPC's extreme indifference murder and reckless manslaughter statutes. MPC Commentary, § 210.2 comment 5, at 28–29 (1980). Further, the MPC eliminated "strict liability" felony murder and created instead a presumption that the commission of certain enumerated felonies is an objective circumstance that demonstrates both that the defendant acted recklessly and that his conduct was sufficiently callous to the value of human life that death caused during the commission of one of those felonies was extreme indifference murder, as opposed to manslaughter or some other type of homicide. *See* MPC Commentary, § 210.2 comment 6, at 29–42 (outlining the reasons for this change).

Although § 76–5–203, *supra*, note 3, is consistent with the MPC murder statute and the commentary's discussion of malice aforethought, it clearly contains significant departures. First, the statute retains the common law "intent to cause serious bodily injury" mental state as a separate mental state from depraved indifference murder.

Second, the Legislature departed from the MPC's formulation of depraved indifference murder. The MPC formulation imposes murder liability if the actor recklessly causes death under circumstances evidencing extreme indifference to human life. MPC § 210.2(1)(b). Section 76–5–203(1)(c) originally defined depraved indifference murder as a homicide committed when the defendant *"recklessly* engaged in conduct which created a grave risk of death to another" under circumstances evidencing depraved indifference to human life. § 76–5–203(1)(c) (1978 ed.) (emphasis added). In 1979, the Legislature deleted the word "recklessly" from § 76–5–203, and this Court held that mere reckless conduct was not sufficient to prove the offense of second degree murder. *State v. Bindrup,* 655 P.2d 674, 676 (Utah 1982). In *State v. Fontana,* 680 P.2d 1042 (Utah 1984), we held that to be liable under § 76–5–203(1)(c), the defendant must act *knowingly* and be aware that his conduct creates a grave risk of death. *Id.* at 1046.

Finally, the Utah Legislature retained felony murder as a separate category of murder, rather than as a circumstance from which recklessness and depraved indifference can be presumed. § 76–5–203(1)(d).

Despite these departures from the Model Penal Code, it is clear from *Russell,* 106 Utah 116, 145 P.2d 1003, and the MPC Commentary that all of the mental states in § 76–5–203(1)(a), (b), (c) are essentially forms of common law malice aforethought. Each is at least "an intention or design previously formed to do an act or omit to do an act, knowing that the reasonable and natural consequences thereof would be likely to cause death or great bodily injury." *Russell,* 106 Utah at 126, 145 P.2d at 1007.

Not only is each mental state in the Utah statute a form of common law malice aforethought, but each one also amounts to a varied form of depraved indifference murder. Certainly, intentionally causing death demonstrates depraved indifference to the value of the life taken.

The significance of purpose or knowledge as a standard of [murder] culpability is that, cases of provocation or other mitigation apart, purposeful or knowing homicide demonstrates precisely such indifference to the value of human life. MPC Commentary, § 210.2 comment 4, at 21. Therefore, a juror who finds that a defendant intentionally or knowingly committed a homicide must necessarily find depraved indifference because a defendant who intends to kill is aware that his conduct creates a grave risk of death.

A person who intends to cause serious bodily injury while doing an act "clearly dangerous to human life" also acts with a depraved indifference to the value of human life. Serious bodily injury is defined as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ or creates a substantial risk of death." § 76–1–601(9). A person whose "conscious objective or desire" is to cause that type of injury while committing an act clearly dangerous to human life, § 76–2–103(1), also demonstrates depraved indifference. The objective depraved indifference judgment is made out when the nature of the injury the defendant intends to cause is "serious," as opposed to "slight." See MPC Commentary, § 210.2 comment 5, at 28–29 (intent to "cause injury of a particular nature or gravity is, of course, a relevant consideration in determining whether [a defendant] acted with 'extreme indifference to the value of human life' ").

It follows that regardless of which mental state individual jurors relied upon in reaching this verdict, all agreed that the defendant knowingly engaged in conduct that created a grave risk of death to the victims and that he acted under circumstances evidencing a depraved indifference to human life.

Although the jury verdict under § 76–5–203 was essentially logically unanimous, the subsection relating to depraved indifference murder, § 76–5–203(1)(c), could, in cases not clearly evidencing depraved indif-

ference, still present a problem for jurors. Under § 76–2–103(3), a defendant acts "recklessly ... when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or that the result will occur." In other words, engaging in conduct while aware that the conduct creates a substantial and unjustifiable risk is a reckless act that would support a conviction for reckless manslaughter. § 76–5–205(1)(a). This Court reduced a second degree murder conviction to manslaughter in *State v. Bindrup*, 655 P.2d 674 (Utah 1982), because the evidence showed that the defendant "was aware of the risk occasioned by his conduct and that he consciously chose to disregard it." *Id.* at 676.

Murder liability under § 76–5–203(1)(c), on the other hand, attaches when the actor engages in conduct which causes death with "knowledge that [it creates] a grave risk of death to another." *State v. Fontana*, 680 P.2d 1042, 1047 (Utah 1984). Causing death while knowingly engaged in conduct which creates a grave risk of death is virtually the same as causing death while "aware of the risk" occasioned by dangerous conduct. Therefore, after *Fontana*, the only distinction between depraved indifference murder and reckless manslaughter is the additional juror judgment that the magnitude of the risk created by a particular defendant's conduct objectively evidences the defendant's depraved indifference to human life. *See* Development, *Depraved Indifference Murder*, 1985 Utah L.Rev. 150; Note, *State v. Fontana; An Illusory Solution to Utah's Depraved Indifference Murder Mens Rea Problem*, 12 J.Contemp.L. 177, 186–87 (1986). In cases where the facts do not necessarily demonstrate depraved indifference to the value of human life, a jury might not examine carefully reckless manslaughter if some jurors are of the opinion that the defendant acted intentionally, while some think the defendant acted merely with knowledge that his conduct created a grave risk of death. If unanimity were not required, a manslaughter conviction, no matter how viable an

alternative, would not be seriously considered by the jury.

That problem is not presented here, however, because the facts of this case clearly meet the objective depraved indifference standard. The defendant told Floyd and LaRue, "If I don't start getting some answers, I am going to start blowing everybody away." He pointed his gun at Floyd and when Floyd attempted to move it away, he shot Floyd once in the chin. He then ran outside, and when LaRue went back in the house, he shot at her through the window. He also testified that he knew the gun was a dangerous weapon and was aware of the probable result if someone were to shoot another in the face.

In sum, a court should require unanimity as to the mental state when a jury could base a conviction on two or more mental states and a lesser·included offense is a possible alternative conviction depending on the mens rea found by the jury. Careful attention should also be paid in cases involving other crimes where perhaps even more subtle distinctions exist between the alternative mental states and other lesser included mental states. Because of the essential nature of a defendant's mental state to a finding of culpability, and because of the subtle distinctions between various mental states, fundamental fairness clearly requires unanimity on the issue of the defendant's mental state.

DURHAM, Justice (concurring in the result):

Although I concur in the result reached by the majority opinion, I believe that its analysis of the unanimity rule is insufficient and possibly misleading. Therefore, I write separately to explain what I believe to be the appropriate context of the unanimity rule analysis in second degree murder cases in Utah.

Under the · Utah Constitution and the Utah Code, a unanimous jury verdict is required in all criminal cases.[1] Utah Const.

art. I, § 10; U.C.A., 1953, § 77–35–21(b). Moreover, the State must prove each element of the offense beyond a reasonable doubt. U.C.A., 1953, § 76–1–501. The words "element of the offense" mean:

(a) The conduct, attendant circumstances, or results of conduct proscribed, prohibited, or forbidden in the definition of the offense;

(b) The culpable mental state required. *Id.*

Although this Court has never established a requirement that a trial court give a unanimity instruction when a defendant could be convicted of a crime under alternate theories, several early Utah cases discussed the problem. In *State v. Rasmussen,* 92 Utah 357, 68 P.2d 176 (1937), the State charged the defendant with involuntary manslaughter; in the information, it alleged several acts constituting reckless driving, any one of which would have supported a conviction on the offense charged. The jury was instructed that in order to convict the defendant, it had to find beyond a reasonable doubt that he had committed "one or more of the acts" alleged in the information. The plurality opinion found that this instruction constituted prejudicial error because it permitted "each juror to choose any one or more of the five separate unlawful acts ... which, if the minds of the jurors could be screened, might disclose at least five separate verdicts upon five separate and distinct grounds." 92 Utah at 371, 68 P.2d at 182–83. A majority of the Court, however, disagreed with this assessment of prejudicial error. Three justices writing separately found that the instructions given did not prejudice the defendant because they essentially required jury unanimity on "one or more" of the acts alleged in the information.

In *State v. Roedl,* 107 Utah 538, 155 P.2d 741 (1945), the defendant challenged the trial court's instruction on felony-murder in a case in which the information charged him only with "willful, deliberate, mali-

---

**1.** For an excellent discussion of jury unanimity see Trubitt, *Patchwork Verdicts, Different-Jurors Verdicts, and American Jury Theory: Whether* *Verdicts are Invalidated by Juror Disagreement on Issues,* 36 Okla.L.Rev. 473 (1983).

cious, unlawful and premeditated killing," but the jury was also instructed on felony murder based on robbery. 107 Utah at 550, 155 P.2d at 747. The Court cited *Rasmussen* (inaccurately) as

> [holding that] ... in a prosecution for involuntary manslaughter wherein several ... acts ... were alleged to have been committed resulting in death, the jury must unanimously agree on one or more of the specified unlawful acts and they may not combine their conclusions on different specified acts so as to converge on an ultimate verdict of guilty.

107 Utah at 551, 155 P.2d at 747. *Roedl*, however, found no error in that case because the overwhelming evidence supported the finding of an intentional killing, and the Court was "convinced from a reading of the record that the jury could only have agreed upon the premeditated killing...." *Id.* at 552–53, 155 P.2d at 747–48. In other words, the evidence of robbery and the instruction thereon were determined by the Court to be merely "incidental" and not prejudicial to the defendant's right to jury unanimity on the elements of the crime charged.

In *State v. Bleazard*, 103 Utah 113, 133 P.2d 1000 (1943), and in *State v. Thompson*, 110 Utah 113, 170 P.2d 153 (1946), the Court again considered arguments concerning the trial court's claimed failure to give a sufficiently specific unanimity instruction. In both cases, however, the Court found that the instructions given in fact required jury unanimity on one of the acts underlying the conviction of the offense charged; therefore, the Court did not separately treat the issue of whether such instructions were generally required. *Bleazard*, 103 Utah at 118–19, 133 P.2d at 1002–03; *Thompson*, 110 Utah at 119–21, 170 P.2d at 156–57.[2]

The cases cited above indicate that a unanimity requirement is not an aberration in Utah jury instructions and in fact has been upheld when used. Thus, instructions requiring unanimity, although not universally required, have been an accepted practice in this state. Furthermore, the implication from the careful consideration of the issue by the Court in the foregoing cases is that jury unanimity on the elements of an offense is an important safeguard in criminal proceedings.

Cases from other jurisdictions have developed principles establishing specific exceptions to the general requirement of jury unanimity. Those exceptions may be summarized as follows: (1) a single crime has been charged, even though it may be committed in alternative ways or by alternative but related acts, (2) those acts are not substantially distinct from each other in terms of either their legal, factual, or conceptual content, and (3) the State has presented substantial evidence supporting each alternative mode of commission of the crime.

The foregoing three exceptions to the unanimity rule have their origins in three seminal cases. In the first, *People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989 (1903), the court concluded that unanimity was not required when a single crime was charged. *Sullivan* has been applied most frequently in cases involving questions of variable intent, or mens rea, underlying a single crime. In the second, *United States v. Gipson*, 553 F.2d 453 (5th Cir.1977), the court of appeals reversed a conviction because the trial court's instructions permitted the jury to convict the defendant without reaching agreement on what act or group of acts the defendant had committed. The court of appeals held that the jury must substantially agree on "just what the defendant did," *id.* at 457, because when "conceptually distinct" alternatives for the actus reus of a crime are charged, the jury must be unanimous on at least one of the alternatives before returning a guilty verdict. (In this regard, *Gipson* seems to be consistent with the early Utah cases discussed above.) *See also* Case Comment,

---

2. In *Thompson*, the Court questioned the construction given *Rasmussen* in the *Roedl* decision. *Thompson*, 110 Utah at 118–19, 170 P.2d at 156. The *Thompson* decision did not, however, treat the issue of mandatory instructions requiring jury unanimity because it found that the instruction given in that case required unanimity.

*Right to Jury Unanimity on Material Fact Issues: United States v. Gipson,* 91 Harv.L.Rev. 499 (1977).[3]

Finally, the third exception to the unanimity rule, which requires that the State produce substantial evidence on each supporting alternative method of committing a crime, has its origin in the case of *State v. Arndt,* 12 Wash.App. 248, 529 P.2d 887 (1974), *aff'd,* 87 Wash.2d 374, 553 P.2d 1328 (1976). In *Arndt,* the court said, "If substantial evidence is presented to support each alternative method of committing a single crime, and the alternatives are not repugnant to each other, then unanimity of the jury as to the mode of the commission is not required." 529 P.2d at 889. *See State v. Benite,* 6 Conn.App. 667, 507 A.2d 478, 483 (1986).

Thus, before the unanimity rule may be dispensed with, courts must undertake a three-part analysis. The first inquiry is whether the statute defines a single offense that may be committed in more than one way or instead defines multiple offenses. *See Sullivan,* 173 N.Y. 122, 65 N.E. 989 (1903). When a single offense is defined, the next step is to determine if the alternative modes of commission are separate and distinct from each other in terms of their legal, factual, or conceptual content. This analysis will often focus on whether the modes of commission depend merely on alternative mental states (as, for example in this case, where the jury was required to compare the statutory alternative of "intent to cause serious bodily injury combined with commission of an act clearly dangerous to human life" with "conduct creating grave risk of death combined with evidence of depraved indifference to human life"). On occasion, however, statutes may also refer to actions, as opposed to mental states, which are also virtually indistinguishable in terms of their legal import, although factually distinct. An example is U.C.A., 1953, § 76–6–302, which includes in the definition of aggravated robbery the use of "a firearm or a facsimile of a firearm, knife or a facsimile of a knife or a deadly weapon." Just as no purpose would be served by requiring juries to be unanimous on alternative mental states, any of which can legitimately be inferred from the same facts, and any of which is sufficient to support a conviction for a single offense. It would be insignificant in an aggravated robbery case whether individual jurors unanimously decided that a firearm used in a robbery was "real" or a "facsimile" in order for them to convict.

Once it has been determined that a single crime has been charged and that the alternative methods of committing it do not contain meaningful differences in their legal or factual content, one further inquiry must be made before a unanimous verdict on the alternatives may be dispensed with. That inquiry is whether there is factual support in the evidence for a conviction under all of the alternatives charged. *See Arndt,* 12 Wash.App. 248, 529 P.2d 887 (1974). The majority suggests that this analysis is the only one which need be undertaken, asserting:

The decisions are virtually unanimous that a defendant is not entitled to a unanimous verdict on the precise manner in which the crime was committed, or by which of several alternative methods or modes, or under which interpretation of the evidence so long as there is substantial evidence to support each of the methods, modes, or manners charged.

**3.** Despite the broad holding in *Gipson,* that decision has not led to a wholesale reversal of convictions in subsequent cases. Rather, when alternative acts are alleged, the courts have sometimes identified a legislative intent to define an "umbrella" act that is the target of the offense. *See, e.g., State v. Bratthauer,* 354 N.W.2d 774 (Iowa 1984) (holding driving under the influence of alcohol and driving with blood alcohol level of .10 percent are consistent alternative ways to commit the crime of driving a motor vehicle while intoxicated, *id.* at 777); *accord State v. Franco,* 96 Wash.2d 816, 639 P.2d 1320 (1982); *Manson v. State,* 101 Wis.2d 413, 304 N.W.2d 729 (1981) (treating "use of force" and "imminent use of force" in the Wisconsin Armed Robbery Statute as not conceptually distinct alternatives because the two acts were "practically indistinguishable," *id.,* 304 N.W.2d at 737); *Holland v. State,* 91 Wis.2d 134, 280 N.W.2d 288 (1979) (holding that unanimity as to the precise manner of participation in the crime, i.e., directly committing the crime, aiding and abetting, or conspiracy, was not necessary).

This approach is inadequate and ignores the other necessary questions: first, whether the crime charged is a single offense that can be committed in more than one way or, instead, multiple offenses; second, if a single offense is charged, whether the alternative methods of commission are significantly distinct from one another in terms of their legal or factual content; and third, whether there is evidence on each of the alternatives. I agree that the three sections of Utah's second degree murder statute, under which the defendant in this case was charged, define a single offense that may be committed in three separate ways. I further agree that the three alternatives are not meaningfully distinct from one another because they merely address different forms of mens rea, any or all of which could properly be inferred from the evidence and any or all of which are proper predicates for guilt of the offense charged. Finally, I agree that there was adequate evidence to permit conviction based on any of the three alternative mental states at the time of the killing. Therefore, I concur in the majority's result, and only object to the overly broad scope of the opinion and its failure to refine adequately the standards for appropriate application of the unanimity rule in other cases.

ZIMMERMAN, J., concurs in the result.