STATE v. ROEDL

No. 6711.   Decided January 25, 1945.   (155 P. 2d 741.)

See 22 C. J. S. Criminal Law, Sec. 244. Participation in homicide by one not the actual perpetrator, and present without preconcert or conspiracy, note, 12 A. L. R. 275. See, also, 26 Am. Jur. 197.

*Ray E. Dillman*, of Roosevelt, for appellant.

*Grover A. Giles*, Atty. Gen., *Herbert F. Smart* and *W. Stanford Wagstaff*, Asst. Attys. Gen., and *Wm. Stanley Dunford*, Dist. Atty., of Provo, for respondent.

VAN COTT, District Judge.

The appellant was convicted of murder in the first degree and sentenced to be executed. From the verdict of the jury and the sentence by the court the appellant appeals.

The evidence shows that the appellant, James Joseph Roedl, and one LeRoy Edward Ritchey first became acquainted in the early part of October, 1942, at Scotts Bluff, Nebraska. Traveling west and just outside of Denver, Colorado, they were given a ride by the deceased, Abigale Agnes Williams, who was driving a 1930 Model A Ford sedan. The car was heavily loaded and accompanying the deceased were two dogs. By reason of the loaded condition of the car, it seems to have been necessary, or at least convenient, for Roedl and Ritchey to ride in the front seat of the car. After reaching Vernal they proceeded on U. S. highway No. 40, toward Fort Duchesne.

The appellant gave a written confession which was introduced in evidence and which will be used for a statement of his version of the facts as to what transpired after leaving Vernal.

"It was dark when we left Vernal, Utah, Roy Ritchey was driving. I was sitting in the middle of the front seat with Mrs. Williams sitting on my right. Mrs. Williams had a blanket pulled up around her head to keep warm, and I wrapped myself up with a blanket and slid down in the seat and fell asleep. All of a sudden I woke up by something striking my face and heard Mrs. Williams say, 'Please don't hit me any more.' I turned my face to lok at her, and there was blood streaming down her face and she had her left hand up as though to protect herself, and I noticed her hand was also covered with blood. I saw Roy hit her with a hammer again with a short choppy blow, just as Mrs. Williams asked him not to hit her again. During this time, Roy was driving very slow, barely moving along, and he was holding the hammer in his right hand and was hunched up over the wheel. Roy then told me to take the hammer, which I did, and told me to hit her and I told him I wouldn't do it and I dropped the hammer. Roy then shoved something into my left side, which I took to be a gun, and told me to pull the blanket over Mrs. Williams face which I did. Then I felt myself having a convulsive seizure and when I woke up Roy had the car stopped off the pavement and had the right door open and I noticed my right arm was up over the back of the seat in back of Mrs. Williams. Roy reached in and pulled Mrs. Williams out and I noticed he had the hammer in his right hand. Mrs. Williams was groaning and gasping for breath as Roy was pulling her out of the car. She rolled

part way down the bank, almost to the bottom of the ditch. Roy then pulled her on down to the bottom of the ditch, and I saw him hit her nine or ten times more."

The confession continues but relates to their traveling through Idaho and into the State of Washington where the appellant was arrested.

Much of the evidence of other witnesses introduced by the state bears out the physical facts as related by the appellant.

That the appellant is subject to epileptic fits is abundantly supported by the evidence of the doctors and the other witnesses that testified in the case. That he had such a fit as claimed by him during the commission of the crime is disputed by the medical testimony and apparently the jury decided that he did not.

On the morning of the 13th of October, 1942, a Mrs. Clark was traveling on foot in an easterly direction from Fort Duchesne towards Vernal when her attention was attracted by the barking of a small white dog on the north side of the highway and down in the barrow pit. Mrs. Clark walked to the edge of the paved portion of the highway and observed an object which resembled the body of a human being. The body was found 772 feet 7 inches west of the Uintah River Bridge in Uintah County, State of Utah.

The appellant was subsequently tried in the Federal District Court, Salt Lake City, Utah, and convicted of murder. Before judgment was pronounced the Federal District Court ruled that the Federal Court did not have jurisdiction over the appellant and thereupon the trial from which the appellant appeals was commenced in the State Court. At the trial in the State Court the appellant entered a plea of once in jeopardy and in support thereof introduced Exhibit B, which is the indictment in the United States District Court, Central Division, No. 14291, and which indictment is against the appellant James Joseph Roedl. It was stipulated that a trial was had on this indict-

ment, evidence was submitted and a verdict rendered. It was also stipulated that appellant in this cause is same as defendant in said Federal Court. The trial court, after hearing this evidence and considering the stipulation, refused to dismiss the charges of the state against the appellant.

To support this appeal and for the purpose of obtaining a reversal of the judgment, appellant has presented twelve assignments of error. We shall consider and discuss each assignment of error seriatim.

Assignment no. 1 is directed to the plea of former jeopardy and former conviction in the Federal Court, and goes to the jurisdiction of the Federal and State Court in this case.

As is shown in appellant's brief, the place on U. S. Highway no. 40, and at the point west of the Uintah River Bridge where the body of Mrs. Williams was found and where this crime was committed, is part of the Uintah Indian Reservation. Appellant takes the position that because such land is part of the Indian Reservation that the United States has jurisdiction over the crime committed thereon, regardless of the race of the individual committing the crime or the race of the one against whom the crime was committed. And if the Federal Court did in fact have jurisdiction that jeopardy attached to this appellant and the State Court should have granted a dismissal on the appellant's plea of former jeopardy.

Counsel in support of his position cites us to Article III, par. 2 of the Constitution of Utah and contends that this paragraph reserves control of Indian lands in Congress. This section of the Constitution of this state has been by us compared with the same section in the Montana Constitution. We find them to be practically identical. The Montana Constitution was considered by the Supreme Court of the United States in the case of *Draper* v. *United States,* 164 U. S. 240, 17 S. Ct. 107, 109, 41 L. Ed. 419, a case very much similar to the one at bar.

In the Draper case the plaintiff in error was indicted, tried, convicted and sentenced to death in the Federal Court

for the crime of murder alleged to have been committed on the Crow Indian Reservation. He moved to arrest the judgment on the ground that the court had no jurisdiction to try an offense committed on the Crow Reservation by other than an Indian, as such crime was exclusively cognizable by the proper court of the State of Montana.

The defendant in error contended that the following language taken from the enabling act of Montana, and which language is identical with the language contained in Article II, Sec. 2, of the Utah Constitution, gave the Federal Court jurisdiction. The words in the foregoing upon which the argument is based are the following:

"And said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States."   .

The court in delivering its opinion said:

"Indeed, if the meaning of the words which reserved jurisdiction and control over Indian lands contended for by the defendant in error were true, then the state of Montana would not only be deprived of authority to punish offenses committed by her own citizens upon Indian reservations, but would also have like want of authority for all offenses committed by her own citizens upon such portions of the public domain, within her borders, as may have been appropriated and patented to an Indian under the terms of the act of 1887. The conclusion to which the contention leads is an efficient demonstration of its fallacy. It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the enabling act by which the state of Montana was admitted into the Union adequately explains the use of the words relied upon, and demonstrates that, in reserving to the United States jurisdiction and control over Indian lands, it was not intended to deprive that state of power to punish for crimes committed on a reservation or Indian lands by other than Indians or against Indians, and that a consideration of the whole subject fully answers the argument that the language used in the enabling act becomes meaningless unless it be construed as depriving the state of authority to it belonging in virtue of its existence as an equal member of the Union.   *   *   *

"Our conclusion is that the circuit court of the United States for the District of Montana had no jurisdiction of the indictment, but 'according to the practice heretofore adopted in like cases should

deliver up the prisoner to the authorities of the state of Montana to be dealt with according to law.'" Citing and considering *United States* v. *Ewing*, D. C., 47 E. 809; *United States* v. *Partello*, C. C., 48 F. 670; *United States* v. *McBratney*, 104 U. S. 621, 26 L. Ed. 869.

Counsel for appellant cites *United States* v. *Clein*, D. C., 189 F. 201. It is true the Federal District Court was held to have jurisdiction over murder happening on a military reservation. The case does not show what jurisdiction was ceded by the State of Washington over such Federal establishments, nor does the case disclose to what race the defendant or the deceased belonged. This case we therefore hold is not authority in this matter.

*United States* v. *Kagama*, 118 U. S. 375, 6 S. Ct. 1109, 30 L. Ed. 228, is not in point as the defendants and the deceased were Indians; *Benson* v. *United States*, 146 U. S. 325, 13 S. Ct. 60, 36 L. Ed. 991, deals with murder committed on Fort Leavenworth Military Reservation within the State of Kansas. The case is not authority for the reason that all jurisdiction was specifically ceded to the United States Government by the Legislature of the State of Kansas prior to the commission of the crime in question.

This disposes of the authorities cited by appellant which are not contained or referred to by the Draper case, supra.

After a full consideration of the matter we are of the opinion that the Draper case and authorities cited therein dispose of appellant's assignment of error no. 1 adverse to appellant and it is so held.

Appellant's second assignment of error is directed to the testimony of Mr. Herbert Snyder, Sheriff of Uintah County, the officer in whose custody the appellant was during the progress of the trial. On the 17th of September, 1943, this witness over objection by the appellant, was permitted to testify that on the 15th of September, 1943, two days prior, in a search of the appellant and the cell in which he was kept, the witness found a table fork in the mattress of his bed, a wire in the appellant's trousers under his belt, a sap or black jack

made from a piece of his bed blanket with a toilet handle wrapped therein. The appellant also surrendered a razor blade which had been concealed in the bottom of a match box.

This evidence is objected to on the ground that it shows the commission by the appellant of a separate and distinct crime not connected with the principal offense in such manner or point of time so as to show the appellant's motive or interest in the commission of the murder of Mrs. Williams.

We are of the opinion that such evidence was not admitted for the purpose of showing the commission of another crime (if such facts constitute a crime), but was for the purpose of showing the desperation of the appellant's plight, his lack of hope of an acquittal, and an attempt upon his part to escape from custody and punishment. Counsel for appellant has cited numerous cases to the effect that separate offenses shown during the trial of a defendant are erroneous, but that is not the situation here, and they are, therefore, not in point.

The following cases and excerpts therefrom show the admissibility of this testimony, the presumption or inference there from which the jury may infer consciousness of guilt upon the part of the appellant, and a desire upon his part to escape from the consequence thereof. *State* v. *Erwin*, 101 Utah 365, 120 P. 2d 285.

In *State* v. *Croxton*, 173 La. 699, 138 So. 513, the court held:

"This evidence admitted showed that Croxton enlarged a hole in the ceiling of his cell and was caught under the roof while trying to effect an opening by means of a piece of iron. The evidence admitted further showed that Croxton asked a state witness to pass him a pistol by means of a string lowered from his cell. Under the circumstances, the jury could fairly infer that the pistol was to be used in an attempted escape.

"In our opinion, the evidence offered by the state was relevant and properly admitted."

In *State* v. *Beatty*, 30 La. Ann. 1266, it is said:

"Attempts to escape on the part of one accused of crime are not of themselves sufficient to authorize conviction, but if shown lend a strong presumption of guilt, unless otherwise explained. They are classed with other ex post facto indications of mental emotion, and are receivable in evidence, but are to be weighed in connection with the surrounding circumstances, and the time at which the attempt is made is not material except as going to show the animus of the accused." *Commonwealth* v. *Green*, 302 Mass. 547, 20 N. E. 2d 417; *Commonwealth* v. *Madeiros*, 255 Mass. 304, 151 N. E. 297, 47 A. L. R. 962; *People* v. *Duncan*, 261 Ill. 339, 103 N. E. 1043.

In *Commonwealth* v. *Mercier*, 257 Mass. 353, 153 N. E. 834, 838:

"The defendant excepted to the evidence that saws, such as might be used in cutting prison bars, were found sewed into his trousers when a search of his prison cell was made. It is contended that such evidence ought not to be admitted in the absence of evidence of an attempt to use the saws. The defendant's own statement, that he received the saws while in prison and sewed them into his clothing fearing that if they were found people might think he was trying to escape, made this evidence competent as tending to show consciousness of guilt. * * * The competency of the evidence does not depend upon proof of an overt act such as would be required to prove the crime of attempting to escape."

We are of the opinion this assignment of error cannot be sustained.

Appellant's third assignment of error relates to the court's permitting in evidence the hypothetical questions put to the doctors, Llewellyn and Young, for the reason the questions did not contain all the elements stated in the written admissions made by the appellant, and upon which the hypothetical questions were based. Counsel contends that it was error not to make reference in said questions to appellant's statement that he had a convulsive seizure at or during the time the killing took place.

For the purpose of fully presenting the problem we will set forth the questions propounded by the district attorney

and the answers of the doctors thereto. The question asked Dr. Llewellyn was:

"Q. Assume a person is killed violently; and the subject under investigation is admitted by the person; assume that he on questions and responsive answers that are asked, that the subject relates having seen certain signs by the side of the road, before approaching the place at about the time of the killing which occurred; and that the subject describes observing blows being delivered to the head of the victim, and that the subject describes the stopping car, in which the crime is being committed; and he describes all of these in response to questions; describes an associate with the happening there, and of the going around the car, and getting out of his side of the car and going around the car, and opening the door, and dragging out the victim, and striking the victim six or seven times with a hammer, would you be able to say from such a relation of circumstances, and responses to the questions asked, whether or not the subject was, at the time, suffering from either a grand or petit mal, or from or over a period of coma following a grand mal? A. In my opinion he would be rational and knew what he was doing."

To Dr. Young the question was:

"Q. Now, Doctor, assume these state of facts: A person has been killed while riding along a highway in an automobile, with a man about the time that the attack occurs, and which attack is done with a hammer; the subject observed and thereafter related of seeing a road sign advertising a cafe and another sign; and related seeing the other person in the car striking the victim on the head with the hammer; and related about the car stopping at a distance some five to seven miles after observing the road sign, and traveling at a slow rate of speed, probably fifteen to thirty miles an hour; at the time the car stopped related of seeing the companion get out of the driver's seat of the car, and go around to the opposite side of the car, open the door and drag the victim from the car; and push it down an embankment, and striking her three—seven or eight times more with a hammer. Assuming all of these matters would you have an opinion as to whether the person relating such circumstances at the time of the occurrence of such circumstances, was of a sufficient—was in a mental state where he would be conscious of the things going on about him? A. My opinion would be that he was clear; that his memory was apparently intact and that he knew of the circumstances that were transpiring at the time."

While the questions are not by any means models to be used, and did not make the inquiry which the district attorney undoubtedly sought to obtain, we do not believe the appellant was prejudiced by them or the answers thereto.

We have read the record most carefully in reference to this matter and are forced to the conclusion that the direct and cross examination of these doctors by the state and attorney for the appellant augmented the questions to the point where the elements, claimed to have been left out, were imported into them.

Furthermore, if the jury understood that the opinions of the doctors were based only on the facts assumed in the questions, then the answers given by the doctors were obviously correct and the appellant could not be prejudiced thereby. If the jury mistakenly assumed that the opinions of the doctors were based on all the facts placed in evidence, then the appellant might have been prejudiced thereby. The doctors did in their testimony give answers which conclusively demonstrated that they would have given the same answers that they did give to the hypothetical questions. Had the element of the appellant's epilepsy and convulsive seizure at the time of the homicide, as claimed by him, been incorporated in the questions, there would be no prejudice to the appellant. This we are convinced the doctors would have done. The appellant was therefore not prejudiced and his assignment must fail.

Assignment of error No. 4 is made to the refusal of the court to permit the jury to sit in the car and demonstrate how the blows might have been struck. The court did permit the jury to examine the car, observe the width of the seat and the physical condition of the automobile in order to, in the court's words,

"determine the truth or veracity of the testimony that has been introduced in evidence here."

The car used at the trial was not the same one used by the appellant, but was identified as the same model, size and make.

This assignment we hold must be denied upon the authority of this court made heretofore in the case of *Balle* v. *Smith*, 81 Utah 179, on page 202, 17 P. 2d 224, on page 234, where we used the following language in a situation very similar to the question involved here:

"The permitting of a view by the jury of articles or property involved in litigation or of the making of experiments of the kind proposed outside of the court is a matter so largely in the discretion of the trial court that its decision will not be disturbed except for palpable abuse. *Konold* v. *Rio Grande Western Ry. Co.*, 21 Utah 379, 60 P. 1021, 81 Am. St. Rep. 693; 22 C. J. 767-790; 3 Jones on Evidence (2d Ed.) 401-410. There was no abuse of discretion on the part of the trial court in refusing to permit a view of the car or a demonstration of the car and its occupancy by the five persons."

Appellant assigns as error the giving of instruction No. 19, which is as follows:

"Robbery is the felonious taking of personal property in the possession of another from his person or immediate presence and against his will accomplished by means of force or fear.

"And in this connection, you are instructed that if the jury believe from the evidence beyond a reasonable doubt, that the said Abigale Agnes Williams was killed by the defendant Roedl, or the defendant LeRoy Edward Ritchey, when they jointly or concertedly at the time were intending to rob the said deceased, then the defendant herein, Roedl, is guilty of murder in the first degree, although he may have had no intention to take the life of the said deceased."

Counsel sets forth that this instruction was not properly integrated with the other instructions given by the court which directed the jury in reference to the law applicable to a wilful, deliberate, malicious, unlawful and premeditated killing, as was the state's theory and was so charged by the information filed and the bill of particulars furnished the appellant by the district attorney.

Counsel contends that by this failure upon the part of the trial court it left open to the jury to arrive at a verdict of guilty upon different theories, some jurors finding beyond a reasonable doubt that the killing was done upon the theory of a wilful, deliberate and premedi-

tated killing while the others found the appellant guilty on the theory of a killing while in perpetration of a robbery; and therefore the appellant was not convicted by a unanimous concurrence of all the jurors.

We are cognizant of the case of *State* v. *Rasmussen*, 92 Utah 357, 68 P. 2d 176, 184, although not cited by appellant, and at first blush would seem to be authority for appellant's position in this matter. We do feel, however, there are several distinguishing differences in that case and the assignment of error presented here.

While we held in that case in a prosecution for involuntary manslaughter wherein several unlawful acts, such as driving at an unlawful rate of speed, driving without a proper lookout, and others, were alleged to have been committed resulting in death, the jury must unanimously agree on one or more of the specified unlawful acts and they may not combine their conclusions on different specified acts so as to converge on an ultimate verdict of guilty.

In the Rasmussen case the defendant presented to the trial court his requested instruction which was refused and by it sought to point out to the court and jury the necessity of the jurors all agreeing on one or more specified unlawful acts which they must find in order to render a verdict of guilty. In the case at bar no such request was made in order to prevent a possible confusion in the matter. It may also be stated that the evidence upon which this instruction was predicated came from the written confession of the appellant. Furthermore, the alleged unlawful acts of the defendant in the Rasmussen case were the basis and gist of the crime charged and at least one of the necessary elements to be proved beyond a reasonable doubt in proving the crime of involuntary manslaughter and the finding of a verdict of guilty by the jury. It must be remembered that the information and bill of particulars in this case were based on only the theory of a premeditated killing and the killing of Mrs. Williams on the theory while in the perpetration of a robbery was only incidental to the

alleged premeditated killing as charged. No other claim was made by the state and the evidence of a robbery entering into the case came incidentally as a part of the evidence introduced by the state by the introduction into evidence of the appellant's written confession wherein he related the taking of her car and money after the homecide took place.

The whole set of instructions given by the court, except the one in question, were directed along the line of premeditated killing and while the instruction complained of pointed out the law in reference to a killing during the perpetration of a robbery, we are convinced from a reading of the record that the jury could only have agreed upon the premeditated killing of Mrs. Williams by the appellant and that the robbery that occurred thereafter in the taking of her automobile and money was an incident to the commission of this homicide. In support of this, the evidence shows that Mrs. Williams while riding in the automobile was beaten into a state of unconsciousness. This certainly would have been sufficient to render her in a helpless condition and amenable for the perpetration of the robbery, if that is all that was intended by this appellant and his companion. But more than this was done, for according to the written confession, she was then dragged from the automobile, thrown down the barrow pit, and struck nine or ten times more with the hammer. From this evidence can it reasonably be said that appellant only intended to render her helpless for the purpose of robbery, and that no intention to kill existed in the mind of appellant or his companion? The defendant was not harmed by this instruction on the theory of robbery unless some of the jury believed that no intention to kill existed, but that this vicious, unwarranted and murderous assault made at a time after she was rendered prostrate in the car was for the purpose of committing the robbery only and that her death resulted unintentionally therefrom.

To follow and agree with appellant in this would be to disregard the evidence in this case and we cannot assume

that any juror would so have done. We are of the opinion that reasonable minds could not differ on this phase of the evidence and that the evidence is so overwhelming in favor of a premeditated killing and so contrary to any theory of unintentional killing that we are convinced no juror could have followed the instruction relating to the theory of an unintentional killing during the perpetration of a robbery, and that the appellant was not prejudiced by this instruction.

The evidence in this case is such as was described by Mr. Justice Wolfe in his opinion in the Rasmussen case, wherein he said:

"What may be prejudicial on a close case may not be in a case where the evidence is fairly clear. If we take a case where there is a mountain of evidence for one side and a molehill of evidence for the other side, an instruction, which in a close case would likely puzzle the jury or influence them in such case, may not be prejudicial, because, regardless of instructions, it would be very unlikely that they would decide in favor of the molehill."

And also as Mr. Justice Larson in the same case said:

"I do not believe that a court should presume that a jury did wrong; that they misconstrued the court's instructions; or that of two courses of action, the jury would choose the path of error."

Appellant's assignment of error No. 6 assails instructions Nos. 5 and 6, as confusing and misleading to the jury. No argument is made, nothing pointed out as to how they could harm appellant, except to say No. 6 is not a proper definition of murder. In *State* v. *Russell*, 106 Utah 116, 145 P. 2d 1003, we criticized a similar instruction. The instructions here involved were almost identical with those involved in the Russell case. Instruction No. 5 defined "murder in the first degree" and No. 6 attempted to define "murder in the second degree," making the same errors pointed out in the Russell case. But not every erroneous instruction is harmful or calls for a reversal. The error in the instruction as given

(No. 6) is that it defines second degree murder as involving the same elements as first degree murder. It is not claimed that the instructions do not fit the evidence. In this case there was no occasion to give any instruction at all with respect to murder in the second degree. Under all the evidence, both for the state and appellant's own confession, there was a wilful, deliberate, aforethought and planned murder committed for the purpose of robbery. Whether Roedl actually struck the blows or aided and abetted Ritchey in doing so, he would be equally guilty of first degree murder. The question for the jury was: Did Roedl aid or abet, or participate in a murder? If so, he was guilty of first degree murder. Under the record in this case, to give an instruction on second degree murder was unnecessary, but one of which appellant cannot complain. Since the jury found him guilty of first degree murder, the fact that the court erroneously told the jury they could let him off easier cannot be harmful to him. The rule is settled by a long line of decisions of this court. *State* v. *Thorne*, 39 Utah 208, 117 P. 58; Id., 41 Utah 414, 126 P. 286, Ann. Cas. 1915D, 90; *State* v. *MeWhinney*, 43 Utah 135, 134 P. 632, L. R. A. 1916D, 590, Ann. Cas. 1916C, 537; *State* v. *Oblizalo*, 60 Utah 47, 205 P. 739; *State* v. *Angle*, 61 Utah 432, 215 P. 531; *State* v. *Ferguson*, 74 Utah 263, 279 P. 55.

Assignment of error No. 7 is directed to the court's instruction defining malicious, premeditated and deliberate, as being inaccurate to the extent that it related to the time and degree of premeditation to make a crime first degree murder.

The instruction as given will be set forth herein and will be divided as to each part under consideration.

"The terms 'malice or malicious' import a wish to vex or annoy or injure another person; or an intent to do a wrongful act, established either by proof or by presumption of law."

While the definition of this term is not in accord with our former decision in *State* v. *Russell*, 106 Utah 116, 145

P. 2d 1003, 1007, where we held that this definition was incorrect as a definition of the term "malice" as used in our statute defining murder which was merely a codification of the common law definition of murder, and that we adopted that definition together with the common law interpretation thereof and held so far as material here:

"In order to have the necessary malice to commit murder * * * the killing must be * * * caused by an act * * * committed with one of the following intentions: (1) An intention or design * * * to kill or cause great bodily injury."

We do not think that in so defining malice the court committed prejudicial error. By instruction No. 2 the jury was told that in order to find the defendant guilty of murder in the first degree they must be satisfied "that the killing was deliberate and premeditated and with the specific intention" to take the life of the deceased. If this instruction was followed by the jury then the jury must have found the necessary elements of malice as defined in the Russell case.

"The term 'wilfully' when applied to the intent with which an act is done, or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law or to injure another or to acquire any advantage."

Appellant's assignment as to this term must fail as the trial court used the definition as given in 103-1-3, Utah Code Annotated 1943.

The court defined "premeditated" as follows:

"Premeditated means thought of beforehand, for any length of time however short. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill; and when the time is sufficent for this, it matters not how brief it is. The human mind acts with celerity, which it is sometimes impossible to measure, and whether deliberate and premeditated design to kill was formed, must be determined from all the circumstances of the case."

The first sentence of this part of the instruction is an exact quotation from an instruction given in the case of *People* v. *Callaghan*, 4 Utah 49, 56, 6 P. 49. The remaining part of the above is taken from *People* v. *Majone*, 91 N. Y. 211, and citing *People* v. *Constantino*, 153 N. Y. 24, 47 N. E. 37; *People* v. *Conroy*, 97 N. Y. 62; *People* v. *Hawkins*, 109 N. Y. 408, 17 N. E. 371; *People* v. *Johnson*, 139 N. Y. 358, 34 N. E. 920; *State* v. *Anselmo*, 46 Utah 137, 148 P. 1071; *State* v. *Stenback*, 78 Utah 350, 2 P. 2d 1050, 79 A. L. R. 878.

Deliberate was defined by the court as follows:

"Deliberate means in a cool state of blood, not a sudden passion engendered by a lawful, or some just cause of provocation."

This definition likewise is from the case of *State* v. *Bobbst*, 269 Mo. 214, 190 S. W. 257. See also Vol. 11, Words and Phrases, Perm. Ed.

As pointed out by this court in the case of *State* v. *Russell*, 145 P. 2d 1003, 1009,

"There can be no distinction in the length of time required to think out beforehand, in premeditation and deliberation."

This language is not in conflict with the definitions of the trial court's instruction, and the appellant must fail in this assignment of error.

Other assignments of error were made which we have not discussed but which we have carefully considered and find them without merit and that no useful purpose would be accomplished by a discussion thereof. We find no reversible error in the record. It follows therefore that the judgment and sentence appealed from should be, and the same is, affirmed.

LARSON, C. J., and McDONOUGH, WADE, and WOLFE, JJ., concur.

TURNER, J., being disqualified, did not participate herein.