**STATE of Utah, Plaintiff and Appellee,**

v.

**Billy Donald CAYER, Defendant and Appellant.**

**No. 900297–CA.**

Court of Appeals of Utah.

June 25, 1991.

Dale M. Dorius (argued), Dorius and Miller, Brigham City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., Dan R. Larsen (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before GREENWOOD, JACKSON and RUSSON, JJ.

## OPINION

GREENWOOD, Judge:

Defendant, Billy Cayer, appeals his conviction of murder in the second degree, a first degree felony, in violation of Utah Code Ann. § 76–5–203 (Supp.1989), after a jury trial. We affirm.

## BACKGROUND

Defendant was originally charged along with three others in the beating death of Mike Ramirez. The other three defendants were Donald Brown, Ray Cabututan, and William Cummins. The victim and all four defendants were employed by Western Brine Shrimp Company at the time of the murder.

Western Brine Shrimp Company collects brine shrimp eggs from the Great Salt Lake. The company operates a camp with several trailers for its employees to live in near the western shore of the Great Salt Lake in Box Elder County near Lakeside, Utah.

At the time of the murder, there were four trailers in the camp, in which several employees resided. The victim, Ramirez, resided in a trailer with Eddie Apodaca. Defendant resided with the other three defendants, Brown, Cabututan, and Cummins, in another trailer. Richard Anderson, Eric Tilley, and Sherman Gallardo occupied a third trailer. The fourth trailer was reserved for a foreman, who was absent from the campsite on the night of the murder.

On October 25, 1989, at approximately 9:45 p.m., Cummins went to the trailer occupied by Ramirez and Apodaca and asked Apodaca to come over to his trailer. When Apodaca arrived, the four occupants (defendant, Cabututan, Brown, and Cummins) accused him of lying and not doing his share of the work. All four occupants were intoxicated. A heated argument commenced between Cabututan and Apodaca. Cabututan attacked Apodaca, knocked him onto one of the bunks, and hit him on the head with a sharpening stone. Apodaca escaped to his trailer, told Ramirez what had happened and began changing his clothes in order to leave the camp. Before Apodaca could change, defendant, Brown, Cabututan, and Cummins barged into the trailer. Ramirez positioned himself between the four men and Apodaca. Both Brown and Ramirez drew knives. Brown convinced Ramirez to drop his knife. When he did, Brown, Cabututan, and Cummins forced Ramirez out of the trailer. Defendant remained inside with Apodaca.

From inside the trailer, Apodaca could hear Ramirez being beaten outside. Whenever Apodaca attempted to dress, defendant hit him. Defendant was heavily intoxicated. Apodaca testified that defendant hit him at least twice in the fifteen minutes to half an hour they were in the trailer together. During this time, Cabututan returned to the trailer and retrieved Ramirez's knife. Then Brown entered and instructed defendant to leave Apodaca alone. He told Apodaca to leave the camp. When Apodaca came out of the trailer, he saw Ramirez on the ground being kicked by Cabututan and Cummins. Both men again attacked Apodaca. Cummins hit him with his fist and Cabututan swung a crescent wrench at him. Apodaca ran from the camp and as he looked back, he could see the men kicking Ramirez.

Anderson, Tilley, and Gallardo, who were sleeping in their trailer, were awakened by the fighting. Tilley testified that he heard four different voices telling Ramirez they were going to kill him. When Anderson opened the trailer door, he saw defendant, Brown, Cabututan, and Cummins standing around Ramirez, kicking and hitting him.

Defendant was positioned near Ramirez's legs and feet, kicking. Tilley testified that he could remember only three people standing around Ramirez, but stated that at one point he saw defendant kneeling beside the upper part of Ramirez's body. When Brown threatened Anderson with a crescent wrench, Anderson closed the trailer door. Anderson, Tilley, and Gallardo continued to hear and observe the beating for another forty-five minutes to an hour. They considered trying to break up the fight, but feared that defendant was outside their door. They observed Ramirez's attempts to get up and then saw Brown, Cabututan, and Cummins beat him back to the ground. Gallardo verbally attempted to prevent Cabututan from stabbing Ramirez. Anderson testified that Cabututan hit Ramirez several times with a crescent wrench, that Brown kicked Ramirez, and that Cummins choked him. Throughout the fight, Ramirez begged them to stop.

Finally, when Ramirez could no longer move, the men stopped and returned to their trailer. Anderson, Tilley, and Gallardo observed Ramirez get up, walk to a water barrel, drink some water, and return to his trailer. At 5:00 a.m., Ramirez knocked on their door. He said he could not breathe and that he needed some water. He requested that someone call "911." After he drank the water, he fell backwards and died.

Anderson and Gallardo drove to Lakeside where they called the Box Elder County Sheriff and the owner of Western Brine Shrimp Company. Four officers arrived at the crime scene and arrested defendant, Cummins, Brown, and Cabututan. Standing outside the trailer occupied by defendant and the other three men, Deputy Yeates could see into the trailer and observed tennis shoes, hip waders, and a box, all of which appeared to have blood on them. When defendant requested that Yeates retrieve some hay fever medicine from his trailer, Yeates entered the trailer and saw a wet crescent wrench near the sink, and a knife. Additionally, Deputy Ward, upon entering the trailer to retrieve cigarettes at the request of the trailer occu-

pants, also observed the box, tennis shoes, and crescent wrench in plain view. Later, all these items were seized by the officers. Officer Ward also took photographs of the crime scene, including pictures of blood-stained clothing articles, bloody walls, tools and implements, and the victim's body.

The state's chief medical examiner performed an autopsy on Ramirez. He testified that an external examination of Ramirez's body showed large areas of scraping and bruising, open wounds, twenty individual rib fractures, scalp lacerations, and hemorrhages in the eyes. He concluded that Ramirez had died from the cumulative effect of multiple blunt force head injuries, causing a cerebral edema.

Each of the four men accused of killing Ramirez was tried separately. Defendant's first trial ended in a deadlocked jury. After a second trial, held February 26 through 28, 1990, he was convicted of second degree murder and sentenced to a term of five years to life.

Defendant appeals his conviction and sentence. He asserts that the trial court erred in the following respects: (1) by refusing a motion for a change of venue; (2) by denying a motion to suppress items of blood-stained evidence seized in a warrantless search; (3) by admitting certain prejudicial, inflammatory photographs and other evidence; (4) by having insufficient evidence to convict defendant of second degree murder; (5) by refusing to allow the jury to view the crime scene; and (6) by denying defendant the right to view the crime scene.

## ANALYSIS

*Change of Venue*

■ Defendant argues that the trial court erroneously denied his motion for a change of venue. He contends that he could not receive a fair trial because of extensive pretrial publicity and because the murder and trial took place in a small community.

The right of trial by an impartial jury is guaranteed by both the United States Constitution and the Utah Constitution. U.S. Const. amend. VI; Utah Const. art. I, § 12. Utah Code Ann. § 77–35–29(e) (Supp.1988) provided the mechanism for obtaining a change in venue:

(e)(i) If the prosecution or a defendant in a criminal action believes that a fair and impartial trial cannot be had in the jurisdiction where the action is pending, either may, by motion, supported by an affidavit setting forth facts, ask to have the trial of the case transferred to another jurisdiction.

(ii) If the court is satisfied that the representations made in the affidavit are true and justify transfer of the case, the court shall enter an order for the removal of the case to the court of another jurisdiction free from the objection and all records pertaining to the case shall be transferred forthwith to the court in the other county. If the court is not satisfied that the representations so made justify transfer of the case, the court shall either enter an order denying the transfer or order a formal hearing in court to resolve the matter and receive further evidence with respect to the alleged prejudice.

*See* Utah R.Crim.P. 29(e).

■ A decision to deny or grant a motion for a change of venue is within the discretion of the trial court and will not be reversed absent clear abuse of that discretion. *State v. James*, 767 P.2d 549, 551 (Utah 1989). *See also State v. Bishop*, 753 P.2d 439, 458 (Utah 1988). The ultimate test of whether a denial to change venue constitutes an abuse of discretion is whether a defendant was tried by a fair and impartial jury. *Id.; State v. Lafferty*, 749 P.2d 1239, 1250 (Utah 1988).

Defendant relies on *James* to support his argument that the small community and pretrial publicity in this case prejudiced his trial. In *James*, the defendant, charged with the first degree murder of his infant son, was granted a change of venue before his trial, after an interlocutory appeal to the Utah Supreme Court. The *James* court delineated four factors to be considered by a trial court in deciding whether to order a change of venue: "(1) the standing of the

victim and the accused in the community; (2) the size of the community; (3) the nature and gravity of the offense; and (4) the nature and extent of publicity." *James*, 767 P.2d at 552. As in *James*, we will take into account the totality of the circumstances in discussing the impact of these factors in the instant case. *Id.*

The first factor examines the standing of both the accused and the victim in the community. The accused in *James* had resided in Logan, Utah for only two weeks prior to the disappearance of his son, a three month old infant. He used drugs, wore long hair, and had a markedly different life style than most in that community. Defendant's situation in this case is similar. He was a transient from the south, had lived at the campsite for only a short time, and drank excessively. However, he worked and lived in a desolate section of Box Elder County, whereas the defendant in *James* lived in the city of Logan. The victim in *James* was a three months old baby, while defendant's victim was a male adult. Negative community reactions to the killing of an infant certainly exceed those to the murder of a transient adult. Additionally, in *James*, the defendant originally claimed the infant had been abducted from him, causing the community to be further inflamed when it became known he may have lied.

The second factor is the size of the community. The *James* court emphasized that "the smaller the community, the more likely there will be a need for a change of venue in any event when a heinous crime is committed." *Id.* at 553 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 599–600 n. 22, 96 S.Ct. 2791, 2822 n. 22, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring in the judgment)). Defendant's trial took place in Brigham City, Utah, which has a smaller population than Logan, where the *James* trial was originally set. However, the *James* court placed significant emphasis on the widespread community effort to help locate the infant, as contributing to the potential for bias against James. In *James*, major volunteer efforts of fundraising, poster printing, searches, and other activities occurred before the trial. In the instant case, there was no community effort. The murder occurred in a desolate area, the victim had not disappeared, and defendant was arrested the day after the crime. Except for reading about the case, residents of Box Elder County were not involved.

The third factor addresses the nature and gravity of the crime. In *James*, the defendant was charged with first degree murder of an infant, a capital offense. 767 P.2d at 551. In this case, defendant was charged with the beating death of a less-helpless, adult victim and convicted of second degree murder.

Finally, the fourth factor examines the nature and extent of pretrial publicity. In *James*, the court expressed concern about the media's portrayal of the defendant because of implications and innuendos concerning his complicity in the infant's disappearance. *Id.* at 554. Although the instant case did generate numerous newspaper articles, as well as television and radio coverage, this coverage appears to be straightforward. There is no inflammatory content as found in the *James* publicity.

Further, as the supreme court stated in *Lafferty:* "Evidence of the pervasiveness of the pre-trial publicity is not enough to answer the question of whether the jury was fair and impartial." *Lafferty*, 749 P.2d at 1250. Jurors may form opinions about a defendant's guilt from publicity but that alone does not necessarily disqualify them. *Id.* The test in determining impartiality and fairness rests with whether "any jurors were prejudiced against defendant." *Bishop*, 753 P.2d at 459. The facts herein are much closer to *Bishop* or *Lafferty*, which involved crimes arguably more shocking and heinous, but no community engagement, and where denial of motions for a change of venue was affirmed by the Utah Supreme Court. *James*, 767 P.2d at 555. Examining the factors as related to defendant as a whole, it appears that pretrial publicity would not be likely to result in an unfair jury trial.

In addition, defendant does not claim actual prejudice or bias resulting from media

coverage. The fact that some jurors had knowledge of the case from media accounts is not sufficient, by itself, to establish prejudice. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (jurors need not be ignorant of the facts of a crime). The record indicates that an exhaustive voir dire was conducted and that defendant passed the jury for cause at the end of the jury voir dire.

Because the totality of the circumstances does not indicate prejudice to defendant, and because there is no showing of jury prejudice or bias, we conclude that the trial court did not abuse its discretion in denying defendant a change of venue.

*Suppression of Evidence*

■ Defendant further contends the trial court erred in failing to suppress certain evidence that was seized without a search warrant by Box Elder County deputies. We review fact findings of a trial court on a motion to suppress under a "clearly erroneous" standard and reverse only if such findings are clearly in conflict with the evidence or we are firmly convinced error has occurred. *State v. Hargraves*, 806 P.2d 228, 231 (Utah App.1991). We review conclusions drawn from those fact findings as a matter of law, giving no deference to the trial court. *Id.*

■ We first address the State's claim that defendant has no standing to challenge the seizure of the eight articles from inside the trailer occupied by him and the other three defendants: a blood-stained box, a wrench, hip boots, tennis shoes, a puma bag, a pink bag, a knife, and a shirt.[1] In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the United States Supreme Court noted that fourth amendment rights are personal in nature and that the test of whether one can claim violation of its protections is whether one has a legitimate expectation of privacy in

the area searched. 439 U.S. at 138–50, 99 S.Ct. at 427–34. A defendant "who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy." *Rakas*, 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12. *See also State v. Valdez*, 689 P.2d 1334 (Utah 1984); *State v. DeAlo*, 748 P.2d 194, 196 (Utah App.1987).

Defendant claimed no possessory or privacy interest in any of the items seized. Defendant did, however, have a possessory interest in the trailer itself because he lived there, and therefore he had a legitimate expectation of privacy in the area where the items were seized. Moreover, the small trailer constituted the entire living quarters of the four defendants. We conclude, therefore, that defendant did have standing to challenge the warrantless seizure.

■ Warrantless searches are per se unreasonable absent a recognized exception to the warrant requirement of the fourth amendment. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). *See also State v. Holmes*, 774 P.2d 506, 510 (Utah App.1989). A recognized exception to the warrant requirement is items seized in "plain view." *Texas v. Brown*, 460 U.S. 730, 737–39, 103 S.Ct. 1535, 1540–41, 75 L.Ed.2d 502 (1983) (plurality opinion). *See also State v. Harris*, 671 P.2d 175, 179 (Utah 1983).

■ "The question whether property in plain view of the police may be seized ... must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question." *Brown*, 460 U.S. at 737, 103 S.Ct. at 1541. In *Harris*, the Utah Supreme Court found that lawful vantage points include the front door of a home. *Harris*, 671 P.2d at 179. In *Holmes*, this court described the three requirements necessary to validate seizure under the plain view doctrine: (1) lawful

---

1. The trial court determined that the trailers occupied by the employees had "common areas." It ruled that the defendant had no expectation of privacy in the common area of the trailer he resided in because that trailer was consistently used by other employees of the company. It was the only trailer in the camp-site that had a refrigerator and it was understood that employees could store perishable food in the refrigerator and retrieve those items at any time. Even though the lower court designated part of the trailer as a "common area," the court rejected the State's argument that the defendant lacked standing.

presence of the officer; (2) evidence in plain view; and (3) evidence that is clearly incriminating. *Holmes,* 774 P.2d at 510.

■ In addressing the three prongs of the plain view exception, we begin by looking at whether the presence of the arresting officers outside the trailer door, from where they first viewed some of the evidence, was lawful. Because the officers had been called to investigate a murder at the campsite, they were lawfully at the site. Further, defendant specifically requested that Deputy Yeates enter the trailer to retrieve hay fever medicine for him. Other occupants of the trailer also requested that the deputies enter and retrieve cigarettes. Therefore, the officers were lawfully present both outside and within the trailer at the time of the seizure. A police officer does not violate the warrant requirement if he or she observes incriminating evidence from a place where the officer has a right to be. *Harris,* 671 P.2d at 179.

The second prong of the plain view exception requiring that items actually be in plain view, is also satisfied. Testimony indicates that the tennis shoes, the waders, and the blood-stained box were seen from outside the trailer. The wrench was observed when Deputy Yeates entered the trailer to retrieve defendant's hay fever medicine. When Deputy Yeates retrieved the items he had previously viewed from the front door of the trailer, he saw the pink sack, the puma bag, and the knife.

The third and final prong of the plain view exception requires that the evidence be clearly incriminating. The tennis shoes, cardboard box, puma bag, and hip waders had blood on them. Deputy Yeates had been informed by the dispatcher that knives and wrenches were involved in the murder. Both the wrench and the pink bag were wet. There was probable cause to believe that items with blood on them would be evidence of a crime. Further, the wet condition of the wrench and pink bag could logically imply that someone was attempting to wash away incriminating evidence of a crime. An officer must only have a reasonable belief "that certain items

may be ... useful as evidence of a crime; it does not demand any showing that such a belief be correct.... A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Brown,* 460 U.S. at 742, 103 S.Ct. at 1543 (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)).

Based on the evidence presented, we find that the seizure of the eight items was proper and that the trial court did not err in denying defendant's motion to suppress.

*Admission of Evidence*

■ Defendant next contends the trial court improperly admitted evidence against him that was inflammatory and prejudicial. That evidence consists of photographs of the victim's body, blood-stained clothing, weapons, and other objects.

Defendant made a general request, prior to the trial, that the court review the evidence to determine its relevancy and prejudicial effect before it was shown to the jury. Defendant made no request for a hearing on his motion, nor did he request a ruling. Therefore, the record is silent as to any ruling on this issue.

At trial, defendant did not object to the introduction of any of the evidence now complained of. Because no pretrial evidentiary hearing took place and because defendant failed to object at trial, he has not preserved this issue for appeal. *See* Utah R.Evid. 103(a)(1); *State v. Johnson,* 748 P.2d 1069, 1071 (Utah 1987); *State v. Griffin,* 754 P.2d 965, 967 (Utah App.1988).

*Insufficient Evidence*

■ Defendant further contends there was insufficient evidence to support a verdict of second degree murder. He claims he was heavily intoxicated the night the murder occurred, that he was inside another trailer "awkwardly swinging his fists" at Mike Apodaca, and that witnesses only saw him once near the feet of the victim and once kneeling beside the victim's upper body.

The appellate standard of review for a claim of insufficiency of evidence is to view the evidence and all inferences that may reasonably be drawn from it in a light most favorable to the jury verdict. *State v. Booker*, 709 P.2d 342, 345 (Utah 1985). A jury verdict will be reversed only if the evidence is "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.* (quoting *State v. Petree*, 659 P.2d 443, 444 (Utah 1983)).

Defendant was convicted of second degree murder. Utah Code Ann. § 76–5–203 (1990) provides:

(1) Criminal homicide constitutes murder in the second degree if the actor:

.    .    .    .    .

(b) intending to cause serious bodily harm to another, he commits an act clearly dangerous to human life that causes the death of another; [or]

(c) acting under circumstances evidencing a depraved indifference to human life, he engages in conduct which creates a grave risk of death to another and thereby causes the death of another;

. . . ;

Additionally, the Utah statute on accomplice culpability provides:

Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct.

Utah Code Ann. § 76–2–202 (1990).

Defendant was tried as a party to the crime on the alternative theories of subsections (b) and (c) under section 76–5–203. For a conviction, the jury had to find that: (1) defendant, while intending to cause serious bodily injury to Ramirez, committed an act clearly dangerous to human life, causing Ramirez's death; or (2) defendant, acting under circumstances evidencing a depraved indifference to human life, engaged in conduct that created a grave risk of death, causing Ramirez's death; or (3) defendant, acting with the required mental state, solicited, requested, commanded, encouraged, or intentionally aided others in killing Ramirez.

The evidence presented at trial showed that defendant, along with the other three men, barged into Ramirez's trailer. Defendant remained inside the trailer with Apodaca, while the other three forced Ramirez outside and began beating him. Defendant prevented Apodaca from going outside to help Ramirez by hitting Apodaca every time he attempted to get up. A jury could reasonably conclude this conduct by defendant aided his friends in the beating death of Ramirez.

Furthermore, defendant was seen kicking at Ramirez's prostrate body. Witnesses also saw him kneeling at the victim's upper body. A jury could reasonably infer that he was contributing to Ramirez's beating. Testimony indicates that up to four voices were heard telling Ramirez they were going to kill him. Defendant's shoes, taken from him on the morning of his arrest, had blood on them. Even though the state crime lab could not determine whether the blood was human, a jury could reasonably infer that the blood came from the victim. Further, Ramirez died of cumulative injuries. A reasonable jury could conclude that defendant's participation in the beating contributed to Ramirez's death. Additionally, a reasonable jury could infer that defendant had the requisite mental state for the offense. He made no attempt to aid the victim either by seeking help from the other employees at the camp site, or by intervening on the victim's behalf. The jury could reasonably infer that his participation was sufficient to make him a party to the crime.

The function of a jury is to weigh the conflicting evidence and to draw conclusions from it. *State v. Pierce*, 722 P.2d 780, 781–82 (Utah 1986). A jury is entitled to use its own judgment on what evidence to believe and may draw reasonable inferences from that evidence. *State v. Lamm*,

606 P.2d 229, 232 (Utah 1980); *State v. Schoenfeld*, 545 P.2d 193, 195 (Utah 1976).

Although defendant may have played a relatively minor role in the beating death of Ramirez compared to the other defendants, the jury could conclude, beyond a reasonable doubt, that there was enough evidence to satisfy the requisite elements of the crime. After reviewing the evidence presented to the jury, we conclude that there was sufficient evidence to sustain the conviction.

### Refusal to Allow Jury to View Crime Scene

Defendant also argues that the trial court erred in refusing to allow the jury to view the scene of the crime.

Rule 17(i), Utah Rules of Criminal Procedure, provides guidelines for permitting a jury to visit the crime scene:

> When in the opinion of the court it is proper for the jury to view the place in which the offense is alleged to have been committed, or in which any other material fact occurred, it may order them to be conducted in a body under the charge of an officer to the place, which shall be shown to them by some person appointed by the court for that purpose. The officer shall be sworn that while the jury are thus conducted, he will suffer no person other than the person so appointed to speak to them nor to do so himself on any subject connected with the trial and to return them into court without unnecessary delay or at a specified time.

It is within the discretion of the trial court whether to allow jurors to view a crime scene and that decision will not be reversed unless the trial court has clearly abused that discretion. *State v. Roedl*, 107 Utah 538, 155 P.2d 741, 746 (1945). *See also State v. Mauro*, 159 Ariz. 186, 766 P.2d 59, 77 (1988).

In the instant case, the jury had a diagram of the crime scene, along with other evidence, to assist them in assessing the crime scene. *See People v. Cisneros*, 720 P.2d 982, 984 (Colo.App.), *cert. denied*, 479 U.S. 887, 107 S.Ct. 282, 93 L.Ed.2d 257 (1986); *Mauro*, 766 P.2d at 77. Further, defendant has not demonstrated how he was prejudiced by the court's refusal to allow the jury to visit the scene of the crime. Nor does he provide any legal analysis or authority for his claim. *State v. Amicone*, 689 P.2d 1341, 1344 (Utah 1984).

We conclude that there was no abuse of discretion by the trial court in refusing to allow the jury to view the scene of the crime.

### Refusal to Allow Defendant to View the Crime Scene

As his final issue on appeal, defendant claims that the trial court erred by not allowing him to return to the scene of the crime in order to aid in his own defense.

Because defendant has failed to supply any legal authority or analysis for this issue, we decline to rule on it. Utah R.App.P. 24(a)(9); *Christensen v. Munns*, 812 P.2d 69, 72 (1991); *Amicone*, 689 P.2d at 1344.

### CONCLUSION

We find that the trial court did not err on any of the issues presented. The conviction is affirmed.

JACKSON and RUSSON, JJ., concur.