2004 UT App 3

**STATE of Utah, Plaintiff and Appellee,**

v.

**Parley Parker Pratt STUBBS,
Defendant and Appellant.**

No. 20011035–CA.

Court of Appeals of Utah.

Jan. 8, 2004.

Edward K. Brass, Salt Lake City, for Appellant.

Mark L. Shurtleff, atty. gen., and Kenneth A. Bronston, asst. atty. gen., Salt Lake City, for Appellee.

Before BILLINGS, P.J., BENCH, Associate P.J. and THORNE, Jr., J.

## OPINION

BENCH, Associate Presiding Judge:

¶ 1 Defendant Stubbs appeals his conviction for rape, a first degree felony, in violation of Utah Code Annotated section 76–5–402 (1999). We reverse and remand.

## BACKGROUND

¶ 2 Stubbs was charged with rape, a first degree felony, in violation of Utah Code Annotated section 76–5–402, and forcible sexual abuse, a second degree felony, in violation of Utah Code Annotated section 76–5–404 (1999).[1] Stubbs did not deny sexual activity

---

1. The State cites to the 1999 version of the rape and sexual abuse statutes. Because these stat-

with J.J., the alleged victim, but claimed it was consensual.

¶ 3 J.J. is from a prominent and highly-regarded family in Beaver, Utah. Her mother was, and is, the treasurer for Beaver County. Her grandparents (Grandmother and Grandfather) were both school teachers. Grandmother had been president of the Beaver Education Association and Grandfather had coached the local high school football team.

¶ 4 Stubbs is not a resident of Beaver. He was staying at a local motel while he worked pouring curb and gutter. Fearing he could not get a fair trial in Beaver, Stubbs filed a motion for a change of venue. At a status conference, the court was to address the change of venue motion; however, the court instead took the motion under advisement until the time of trial.

¶ 5 On the first day of trial, the court did not address the change of venue motion until midway through jury selection. The court welcomed the potential jurors and each gave cursory introductions of themselves. The court asked the jurors whether they had any information about the case from any source other than the court. Ms. Riley said that a friend of J.J.'s mother had given her the details of the case. She was also neighbors with the prosecutor. J.J.'s mother had told both Ms. Mayer and Ms. Forest about J.J.'s experience. Mr. Cox had been told about the case by J.J.'s father. Mr. Cox also admitted to being "real good friends" with J.J.'s father and said that, based on the things he had heard, he was "kind of bitter" about the situation.

¶ 6 The court then asked the panel whether they had a relationship with any of the witnesses. Ms. Dalton told the court that she worked with Dr. Melling, a witness for the State, as his nurse. She said that she would not automatically believe anything Dr. Melling said. Ms. Moreno also worked in the local medical clinic with Dr. Melling, but not as his nurse. She saw him every day and told the court that her relationship with Dr. Melling would tend to influence her views. Mr. Lorenzo had worked for the Beaver

County Sheriff's Office eight years earlier for a period of five months. He also knew Officer Chambers, one of the State's witnesses. Ms. Burnette was a close friend of Officer Chambers and she had applied for a job with the prosecution's office.

¶ 7 In chambers, while privately questioning a potential juror, counsel for Stubbs argued in support of his motion for a change of venue. The defense cited the four *James* factors to be used in deciding when a change of venue is required. *See State v. James*, 767 P.2d 549, 552 (Utah 1989). After argument from the prosecution and some discussion of the issue, the court denied the motion for a change of venue. The court reasoned that the law did not contemplate that someone who wandered into a community and was charged with a crime would be able to have the case moved to a different county simply because the victim held a position of prominence. Further, both the court and the prosecutor had witnessed "several cases where in spite of testimony from Beaver County residents, the juries [had] found in favor of the person from outside the community." The court then gave the following summation:

> Overall looking at the entire picture, looking at the answers that I have received and with what I know about Beaver juries, I am satisfied that this jury is prepared to try this case on the evidence presented during the trial and the law as I give it without reference to personalities.... So I'm going to deny the motion to change venue just because of [J.J.'s mother's] ... position and the influence that that might have on the jurors. I haven't found any evidence that it would influence them.

¶ 8 In open court, jury voir dire continued with a question that had been asked before the in-chambers discussion: whether any of the jurors knew J.J.'s grandparents. When numerous hands were raised, the court rephrased the question to ask who did *not* know J.J.'s grandparents. Of the sixteen potential jurors, nine knew the grandparents.

¶ 9 Mr. Nelson had worked with the grandparents on various projects. He also worked with J.J.'s mother. Mr. Barney's son was

utes have not been amended, we also cite to the 1999 edition of the Utah Code.

married to Grandfather's daughter, and Mr. Barney and Grandfather shared some of the same grandchildren. Mr. Gay was a school teacher and worked closely with Grandmother because she was president of the Beaver Education Association. He was also a wrestling coach at a neighboring high school when Grandfather was the wrestling coach in Beaver. Additionally, he was a former neighbor and friend of the prosecutor. Mr. Carpenter was in the same church group as the grandparents. He was also a former leader of J.J. and her mother's church group. Mr. Sherwood's stepbrother and cousin were, like J.J.'s mother, elected officials. Mr. Sherwood also knew Grandfather from when Grandfather was Beaver's football coach. Ms. Albrecht acknowledged that she was "fond" of Grandfather. J.J. had also been on some group dates with one of her sons and had visited her home. Mr. Hansen's wife worked for Dr. Melling. Dr. Melling was a leader of Mr. Hansen's church group. Mr. Hansen also coached high school football and happened to coach Grandfather's grandson; thus, Mr. Hansen often discussed football matters with Grandfather. Mr. Hansen knew who J.J.'s mother was, and had a close friend that was a deputy sheriff. Mr. Edwards bought hay from Grandfather and hauled hay for Grandfather. When asked whether his views would be influenced by the fact that the alleged victim in this case was a granddaughter of Grandfather, he answered, "[M]ost definitely." Mr. Davis had been a neighbor of J.J.'s about twelve years earlier. Mr. Davis's father worked in the same building as J.J.'s mother. Grandfather was Mr. Davis's fifth grade teacher. Ms. McMullin said that Grandfather coached two of her sons and that Grandfather had been "real close" with one of them. Ms. McMullin worked on the Beaver County network board with Grandmother. She was also good friends with Officer Chambers. Ms. Kesler told the court that Grandfather was a teacher when she was in high school. Ms. Kesler would see the grandparents at church and might say, "Hi, how are you?" when passing them on the street. She had also worked in the kitchen at the Beaver County Correctional Facility. Although Ms. Barton did not have a relationship with the grandparents, her sister had been employed by the Beaver County Sheriff's Department and her mother worked with a victim advocacy group.

¶ 10 Some on the panel were stricken for cause. Eight jurors were eventually impaneled and heard the case. Stubbs was convicted of rape and acquitted of forcible sexual abuse. He timely appealed his rape conviction to the Utah Supreme Court, which then transferred the appeal to this court pursuant to Utah Code Annotated section 78-2-2(4) (2002).

## ISSUE AND STANDARD OF REVIEW

¶ 11 On appeal, Stubbs argues that the trial court erred in three ways: 1) by denying his motion for a change of venue; 2) by allowing the prosecutor to impeach him with evidence of prior bad acts; and 3) by instructing the jury on the theory of lack of consent by enticement. We address only the venue issue because it is dispositive to the outcome of this appeal.

¶ 12 "A decision to deny or grant a motion for a change of venue is within the discretion of the trial court and will not be reversed absent clear abuse of that discretion." *State v. Cayer*, 814 P.2d 604, 608 (Utah Ct.App.1991) (citing *State v. James*, 767 P.2d 549, 551 (Utah 1989) (other citation omitted)).

## ANALYSIS

¶ 13 In *State v. James*, 767 P.2d 549 (Utah 1989), "[i]n an attempt to more definitely define the standard to be followed by the trial judge in considering a motion for a change of venue," the Utah Supreme Court explained that a trial judge should grant a motion for a change of venue whenever there is "a reasonable likelihood that a fair trial cannot be had." *Id.* at 552.[2]

¶ 14 There are four factors to consider in determining whether a fair trial can be

2. Citing a California case, the supreme court further explained that "a reasonable likelihood of prejudice does not mean that the prejudice must be more probable than not." *State v. James*, 767 P.2d 549, 552 (Utah 1989).

had and, thus, whether a change of venue is required: "(1) the standing of the victim and the accused in the community; (2) the size of the community; (3) the nature and gravity of the offense; and (4) the nature and extent of publicity." *Id.* When considering the impact of these factors, the totality of the circumstances is taken into account. *See State v. Cayer,* 814 P.2d 604, 608–09 (Utah Ct.App. 1991); *see also James,* 767 P.2d at 552.

¶ 15 The first factor relates to the standing of both J.J. and Stubbs in the community. J.J. was the seventeen-year-old daughter of the elected Beaver County treasurer.[3] J.J.'s grandparents were notable figures in the community, as evidenced by the large number of potential jurors who had some sort of connection with them. It appears from the record that J.J. had been a resident of Beaver County for most, if not all, of her life. She was seemingly exemplary in every respect. Stubbs, on the other hand, was an unknown transient who worked construction, or any other job he could find. He had been in town fewer than two weeks and was staying in a local motel for a short period of time while pouring concrete. He kept a pillow in the back of his truck for the times when he slept on the side of the road. Similarly, in *James,* where the appellate court reversed the denial of the defendant's motion for change of venue, the defendant had resided in Logan, Utah "for only two weeks prior to the disappearance of his son, a three month old infant." *See Cayer,* 814 P.2d at 609.

¶ 16 The prosecution addressed this factor by claiming that there had been similar types of cases in the past where Beaver County juries had found in favor of an "outsider." The court then applied a subjective standard by supplying a personal anecdote that "Beaver County juries are extremely independent and don't tend to favor the local individual against the individual from outside." Moreover, this factor deals not only with whether the victim and accused are *residents* of a particular community, but also with their *standing* within that community. Therefore, it is not enough to say that Beaver County

juries have found for "outsiders" in the past. In this instance, the victim was not just an "insider," she was also the daughter and granddaughter of well-known, highly-regarded members of the community.

¶ 17 The second factor addresses the size of the community—in this case, Beaver County. "The James court emphasized that 'the smaller the community, the more likely there will be a need for a change of venue in any event when a heinous crime is committed.' " *Id.* (quoting *James,* 767 P.2d at 553). The 2000 U.S. Census Bureau reported 6005 residents of Beaver County, ranking it number twenty-four out of twenty-nine counties in Utah in terms of population. The *James* court indicated that Cache County which, in 1986, had an estimated population of 69,200, was "small." *James,* 767 P.2d at 553. Cache County, a small county, was roughly eleven and one-half times larger than Beaver County. The voir dire of the jury attests to the small size of the community: a few of the jurors knew one another, several jurors knew either the prosecutor or one of the State's witnesses, and a majority of the jurors knew J.J.'s family. Although the trial court did not address this factor after it was raised by the defense, clearly, Beaver County is a very small community.

¶ 18 The third factor considers the nature and gravity of the crime. The trial court never mentioned this factor. "In *James,* the defendant was charged with first degree murder of an infant, a capital offense." *Cayer,* 814 P.2d at 609. In *Cayer,* where the appellate court upheld the trial court's denial of a motion for a change of venue, the "defendant was charged with the beating death of a less-helpless, adult victim and convicted of second degree murder." *Id.* Here, the victim was a defenseless juvenile, a virgin who was allegedly raped by a near-stranger eight years older than she was. Rape is a first-degree felony, punishable to the same extent as murder. Considering that Beaver County has averaged only 1.09 rapes per year from 1990–2000, a single instance of rape is certainly a notable, memo-

---

3. The court and prosecution made much of the fact that J.J.'s mother's election was uncontested. We fail to see how an uncontested election changes the fact that J.J.'s mother assumed her position as a result of the popular vote.

rable, and heinous crime. *See* Utah Commission on Criminal & Juvenile Justice, Local Crime Information, *at* http://www.justice.utah.gov.

¶ 19 Finally, the fourth factor deals with the nature and extent of pretrial publicity. The trial court perfunctorily dismissed this factor. The voir dire demonstrates that a number of potential jurors had been given the details of the case from a source outside the courtroom. As for the nature of the publicity, the details of the case had been transmitted directly to the jurors via interested parties rather than from a more removed source like the media.

■ ¶ 20 The State argues that the *James* factors are inapplicable in a situation like this one where a jury has already tried and convicted the defendant. In *State v. Widdison*, 2001 UT 60, 28 P.3d 1278, the supreme court explained that "[o]n appeal from a jury verdict, we do not look to the *James* factors to determine whether the trial court abused its discretion in denying a change of venue. Instead, we examine whether defendant was ultimately tried by a fair and impartial jury." *Id.* at ¶ 38. However, this case is different from *Widdison.* Even though Stubbs takes his appeal from a jury verdict, we apply the *James* factors because they were never appropriately considered by the trial court. Further, the court began jury voir dire before even ruling on Stubbs's motion for a change of venue. This is important because, in *Widdison,* the supreme court recognized that "the unique circumstance of the interlocutory appeal [in *James*] 'afforded us the opportunity to review the denial [of the change of venue motion] before any error committed would be prejudicial to the defendant.' We reversed the order denying the motion to change venue in order to serve judicial economy." *Id.* at ¶ 38 (citation omitted).

¶ 21 In *Widdison,* the defendant filed a motion to change venue in November 1996. *See id.* at ¶ 17. The trial court denied the motion, but allowed Widdison to raise the issue again at trial. *See id.* Widdison's trial did not begin until April 30, 1998. *See id.* at ¶ 18. During the nearly eighteen months that elapsed between the time the court denied Widdison's motion for a change of venue and trial, no interlocutory appeal was taken. By contrast, in this instance, because the trial court did not rule on Stubbs's motion for a change of venue before trial, Stubbs did not have any opportunity to take an interlocutory appeal and thereby "serve judicial economy." *Id.* at ¶ 38.

## CONCLUSION

 ¶ 22 Under the totality of the circumstances, we conclude that the trial court abused its discretion 1) by not ruling on Stubbs's motion for a change of venue before trial, and 2) by failing to properly apply the *James* factors.

¶ 23 We therefore reverse and remand for a new trial, and direct the trial court to grant Stubbs's motion for a change of venue.

WE CONCUR: JUDITH M. BILLINGS, Presiding Judge, and WILLIAM A. THORNE JR., Judge.